# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-IA-00571-SCT

*FAWAZ ABDRABBO, M.D. AND HINDS*
*BEHAVIORAL HEALTH SERVICES*

*v.*

*AUDRAY (ANDRES) JOHNSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/30/2016 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| TRIAL COURT ATTORNEYS: | WHITMAN B. JOHNSON, III |
| | WADE G. MANOR |
| | FELECIA PERKINS |
| | KATRINA SANDIFER BROWN |
| | MICHAEL F. MYERS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | MICHAEL F. MYERS |
| | WHITMAN B. JOHNSON, III |
| | WADE G. MANOR |
| ATTORNEY FOR APPELLEE: | AUDRAY JOHNSON (PRO SE) |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND RENDERED - 05/04/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., COLEMAN AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     This medical-malpractice suit comes before the Court on Dr. Fawaz Abdraddo's and

Hinds Behavioral Health Services' interlocutory appeal from the Hinds County Circuit

Court's order denying defendants' motion for summary judgment.  Finding that Plaintiff

Audray Johnson failed to support his medical-malpractice claims with expert testimony on

whether the defendants breached any applicable standard of care owed to Johnson, we

reverse the trial court's denial of summary judgment and render judgment here in favor of the defendants.

## FACTS AND PROCEDURAL HISTORY

### A. COURSE OF PROCEEDINGS

¶2. Johnson, pro se, filed suit against the defendants on May 13, 2014, claiming he suffered permanent damage to his kidneys due to lithium treatment he received while under the psychiatric care of Dr. Abdraddo, who was working under contract for Hinds Behavioral Health Services. Johnson thereafter filed a motion "to disregard requirement of having a medical expert" based on Johnson's desire to invoke the doctrine of *res ipsa loquitur*[1]. Defendants responded to this motion, setting forth that Mississippi law requires expert testimony in this type of case and the doctrine of *res ipsa loquitur* does not apply.

¶3. On October 9, 2014, attorney Felecia Perkins entered an appearance on behalf of Johnson. A month later, she filed a motion to withdraw as counsel, which the trial court granted. Johnson has since proceeded pro se.

¶4. On October 15, 2014, the defendants filed a motion for summary judgment, which was scheduled to be heard before Hinds County Circuit Court Judge William Gowan on December 4, 2014.

¶5. Before the hearing, Johnson filed a motion to recuse Judge Gowan, accusing him of abusive and rude behavior, and for moving the case along too quickly. Johnson also filed a

---

[1]"The thing speaks for itself." "Res ipsa loquitur is [a] rule of evidence whereby negligence of alleged wrongdoer may be inferred from mere fact that accident happened. . . ." Black's Law Dictionary 1305 (6th ed. 1990.)

motion for more time to appoint a medical expert, claiming he had an expert "on standby," and listing the name and telephone number of a national expert-witness referral service.

¶6. Judge Gowan ruled on Johnson's motion for recusal, stating:

> The undersigned having bent over backwards to explain to the plaintiff in great detail the requirements of a medical malpractice case, i.e., the specific requirement of a medical expert, and plaintiff having perceived this as being "abusive and rude," the undersigned, so as to avoid any misconceived ideas regarding unfairness of the undersigned or the judicial process hereby recuses himself from [this] cause of action.

The case thereafter was assigned to Judge Winston Kidd. The defendants reset their motion for summary judgment for hearing before Judge Kidd on February 19, 2015.

¶7. Johnson filed no supporting memorandum in response to the summary-judgment motion, but he filed the affidavit of Dr. Shobhit Negi on February 9, 2015.

¶8. Defendants filed a rebuttal in support of the summary-judgment motion, contending that the medical-expert affidavit filed by Johnson did not state that any standard of care had been breached and it failed to show any causal connection between any actions of the defendants and the alleged injury.

¶9. On February 19, Judge Kidd heard arguments from all the parties and stated he would review the motions and issue a ruling. On April 21, 2015, Judge Kidd entered an order giving Johnson sixty days to designate a medical expert or his case would be dismissed.

¶10. On April 27, 2015, Johnson filed a "Designation of Experts," attaching the same affidavit from Dr. Negi, filed by Johnson on February 9. Dr. Abdrabbo filed a motion to strike this designation on May 6, 2015, along with a renewed motion for summary judgment.

3

¶11. Johnson subsequently filed four requests for status hearings on May 8, 2015; August 26, 2015; November 18, 2015; and February 18, 2016.

¶12. On March 30, 2016, Judge Kidd entered an order, without opinion, denying the defendants' motion for summary judgment. The order summarily concluded that genuine issues of material fact precluded summary judgment.

¶13. The defendants thereafter petitioned this Court for interlocutory appeal, claiming the trial court erred in denying their motion for summary judgment when Johnson failed to support his medical-malpractice claim with expert testimony on breach of standard of care or causation of Johnson's alleged injury.

## B. UNDERLYING FACTS

¶14. Dr. Abdrabbo is a psychiatrist, working under contract with Hinds Behavioral Health Services. Dr. Abdrabbo began treating Johnson in August 2004 for "schizoaffective disorder." Johnson previously had been prescribed and maintained on lithium for the disorder by a prior treating psychiatrist for approximately ten years. Johnson had a separate primary-care doctor who monitored and treated Johnson's other medical conditions.

¶15. According to Dr. Abdrabbo, for patients initially receiving lithium treatment, monitoring of kidney function is recommended approximately every six months. But yearly monitoring is considered reasonable and acceptable for patients who have been successfully maintained on lithium treatment for some time, as Johnson had been when Dr. Abdrabbo began treating Johnson. For that reason, Dr. Abdrabbo was monitoring Johnson's kidney

4

function on a yearly basis, along with more frequent monitoring of Johnson's lithium levels to make sure they were staying at a therapeutic level.

¶16. Hinds Behavioral Health System does not have in-house capabilities to conduct the blood tests necessary to monitor Johnson's kidney function; thus, the blood tests were performed by Johnson's primary-care doctor, Dr. Timothy Quinn, who reported the lab results back to Dr. Abdrabbo. Johnson's medical records for the relevant period showed he had blood drawn in April 2012 and January 2013 to check his kidney function.

¶17. According to Dr. Abdrabbo, Johnson's records gave no indiction that Johnson had any abnormal kidney function in April 2012. At that time, Dr. Quinn noted that Johnson's lab results reflected "normal kidney function." In January 2013, however, Johnson's lab results indicated a slight elevation in his creatinine level as well as his lithium level. So Dr. Abdrabbo instructed the staff at Hinds Behavioral Health Services to contact Johnson and have him come in to discuss the results.

¶18. Afterward, Dr. Abdrabbo told Johnson that his creatinine level was 1.7, which was slightly above the normal range of 0.7 to 1.5. Johnson's lithium level was 1.5, which also was slightly above the normal range of 0.6 to 1.2. Dr. Abdrabbo explained to Johnson that the deviations were so slight they could be due to diet, dehydration or other factors, and were not necessarily indicative of any problems with his kidneys.

¶19. Dr. Abdrabbo also told Johnson that he had a glomerular filtration rate (GFR) of 47, which is not an actual lab value but is a calculation based on other lab values. That calculation, however, must be adjusted for factors such as race and gender, thus putting

Johnson's GFR at 56, just below the normal range, which is 60 and above. According to Dr. Abdrabbo, a one-time indication of a decreased GFR is not indicative of chronic kidney disease.

¶20. Dr. Abdrabbo told Johnson to lower his lithium dosage and have his labs drawn again, which Johnson did later that month. The subsequent lithium level showed that his lithium had returned back within the expected therapeutic range of 0.8. Johnson's creatinine level, however, had not changed by the time the blood work was done later that same month. But the level had reduced by the time Johnson's blood work next was drawn in June 2013, at which point Johnson's GFR had tested at a normal level after adjustment for Johnson's race and gender.

¶21. Dr. Abdrabbo next saw Johnson in March 2013 and again in April 2013, at which time he noted that Johnson's lithium level was back to its normal baseline. Johnson was scheduled to see Dr. Abdrabbo two months later, but Johnson never came back to see him.

¶22. Dr. Abdrabbo supported his motion for summary judgment with Johnson's medical records (filed under seal with the Court), as well as Dr. Abdrabbo's own affidavit regarding his care and treatment of Johnson. Dr. Abdrabbo also included the affidavits of Dr. Andrew Bishop and Dr. Wilson Parry. Dr. Bishop is a psychiatrist whose affidavit testimony showed that Dr. Abdrabbo's monitoring regime met the appropriate standard of care and that Dr. Abdrabbo had responded appropriately when the January 2013 lab results indicated slight elevations of the lithium and creatinine levels.

¶23. Dr. Abdrabbo testified, as did Dr. Parry, a specialist in nephrology (the function of the kidney and diseases of the kidney), that Johnson did not have any irreversible damage to his kidneys, and never had, as Johnson claims, "kidney failure." Dr. Parry also explained that the temporary change in Johnson's lab values was not attributable to the lithium, but likely to Johnson's high blood pressure.

¶24. Dr. Parry further opined that Johnson's blood-pressure medicine contains a diuretic which can add to dehydration, which effectively would raise Johnson's creatinine level, resulting in an acute but temporary reduction in GFR. Dr. Parry noted that Johnson's January 2013 creatinine level of 1.7 and an adjusted GFR of just below 60 was not indicative of past, present, or future kidney failure.

¶25. In response to the summary-judgment motion and supporting affidavits, Johnson filed the affidavit of Dr. Negi, a psychiatrist. From the records provided to Dr. Negi, Dr. Negi noted that Johnson began receiving psychiatric services at Hinds Behavioral Services in June 1996, and "has been diagnosed with Schizoaffective Disorder, Bipolar type, Hyperlipidemia, Hypertension and Gout." Johnson had received lithium treatment for close to twenty years. Dr. Negi stated that when a patient is on lithium, "the kidney functions should be monitored at least once every six months to a year." He added that, "kidney functions may need to be monitored more closely if a person having high blood pressure is of African American descent and has Gout." Dr. Negi concluded his report with the following:

> Forming an opinion regarding Dr. Abdrabbo deviating from the standard of care in monitoring Mr. Johnson's kidney functions while prescribing him Lithium can be made after I have reviewed Dr. Abdrabbo's records on Mr. Johnson. . . .

7

. . .

It should be understood that this report consists of opinion based only upon the records available to me that have been listed at the beginning of this report. This report may be modified as additional information becomes available from deposition or other records.

¶26. Dr. Negi's affidavit report was never supplemented with any new information or opinion from Dr. Negi.

## DISCUSSION

¶27. A trial court's grant or denial of summary judgment is reviewed de novo. *Leffler v. Sharp*, 891 So. 2d 152, 156 (Miss. 2004). The moving party is entitled to judgment as a matter of law, when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material . . . ." M.R.C.P. 56(c). All the evidence presented must be considered in the light most favorable to the nonmoving party. *Hubbard v. Wansley*, 954 So. 2d 951, 956 (Miss. 2007).

¶28. Unless the matter in issue is within the common knowledge of laymen, Mississippi law holds that, in order to prevail in a medical-malpractice action, the plaintiff must establish through expert testimony the standard of acceptable professional practice; that the physician deviated from that standard of care; and that such deviation was the proximate cause of the injury alleged. *Palmer v. Biloxi Reg'l Med. Ctr.*, 564 So. 2d 1346, 1355 (Miss. 1990).

¶29. As the appellants contend, Johnson's claims require medical-expert opinion beyond the scope of common knowledge. Dr. Negi was the only expert Johnson designated to provide evidence in support of his claims. Dr. Negi's affidavit report offers no opinion on

8

whether or not Dr. Abdrabbo exercised reasonable care in monitoring Johnson's kidney function while prescribing him lithium. Thus, insufficient evidence has been produced to establish a prima facie case of negligence against the defendants.

¶30. The record further demonstrates that Johnson had more than enough time and opportunity to engage in any discovery necessary to prosecute his claims. Pro se parties are held to the same rules of procedure and substantive law as parties represented by counsel. ***Dethlefs v. Beaumaison Dev. Corp.***, 511 So. 2d 112, 118 (Miss. 1987).

¶31. Accordingly, we find that the defendants are entitled to summary judgment on all claims against them.

**CONCLUSION**

¶32. For these reasons, this Court reverses the trial court's decision to deny the defendants' motion for summary judgment and renders judgment here in favor of the defendants.

¶33. **REVERSED AND RENDERED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, MAXWELL AND CHAMBERLIN, JJ., CONCUR.**