996 So.2d 762 (2008)
J.C.N.F.
v.
STONE COUNTY DEPARTMENT OF HUMAN SERVICES.
No. 2007-CA-01252-SCT.
Supreme Court of Mississippi.
December 11, 2008.
*764 James L. Farrior, III, attorney for appellant.
Katherine Jane Caldwell, attorney for appellee.
EN BANC.
GRAVES, Justice, for the Court.
¶ 1. This is an appeal from the termination of the respondent's parental rights by the Stone County Chancery Court. Parental rights were terminated on the basis of several findings made by the chancellor. The respondent appeals and claims that she was denied due process because the chancellor failed to appoint an attorney to represent her at the termination hearing. The respondent also argues that the chancellor's decision to terminate her parental rights was not supported by clear and convincing evidence.

FACTS
¶ 2. On March 3, 2005, J.L.N., then a fourteen-year-old male, and E.D.F., then a ten-year-old female, were placed in the custody of the Stone County Department of Human Services (DHS) when their mother, J.C.N.F., was an hour late in picking them up from school. School officials contacted DHS because the school was preparing to close for the day. A DHS employee went to the school and brought the children to the DHS office pursuant to a Stone County Youth Court order. The DHS supervisor assigned to the case testified at the termination hearing that when the mother arrived at the school, she appeared to be unable to take the children home. A DHS social worker assigned to the case and the DHS supervisor both testified that the mother was then arrested by police. The supervisor stated that she was arrested for driving under the influence and driving with a suspended license. The social worker stated that she was arrested for driving with a suspended license and possession of a controlled substance. The following day, the youth court conducted a shelter hearing and the children remained in DHS custody.
¶ 3. On March 16, 2005, the mother was presented with an Individual Service Plan (the "Service Plan" or "Service Agreement") developed by DHS. The Service Plan required that she complete thirteen tasks in order for DHS to determine whether or not to recommend that the court return her children to her. In exchange, DHS agreed to "provide case management for [the] client." The overall goals for the mother were: 1) to obtain and maintain employment and provide support to the children; 2) to be free from substance use and abuse; 3) to obtain and maintain stable housing; 4) to have dependable transportation; and 5) to know and understand the effects of sexual abuse on victims and families. The mother did not sign the Service Agreement on March 16, 2005 because she wished to have it reviewed by her attorney at the time.
¶ 4. In April 2005, both children were adjudicated neglected by the youth court. The youth court also entered a Disposition Order stating, in part, that the mother would not be permitted to visit her children until she entered into a service agreement with DHS and made a good faith effort to comply with its terms. The mother signed the Service Agreement in October 2005.
¶ 5. In May 2006, the youth court suggested that DHS initiate proceedings to terminate the mother's parental rights. Accordingly, on August 28, 2006, DHS filed a Petition to Terminate Parental Rights. In the petition, DHS alleged that parental rights should be terminated on the basis of six separate factors set out in Mississippi Code Section 93-15-103(3). *765 The petition essentially tracks the language in Mississippi Code Section 93-15-103(3)(d)(i)-(ii), (e)(i)-(ii), (f), and (h). Miss.Code Ann. § 93-15-103(3) (Rev.2004). The petition states that it is in the best interest of the children to have their mother's parental rights terminated "so that a permanent and stable plan for the adoption of the Minor Petitioners may be made and so that the Minor Petitioners will be eligible for adoption." The termination hearing was scheduled for December 4, 2006. On the day of the hearing, the guardian ad litem submitted a report citing the behavioral problems of the children, which the guardian ad litem attributed to the environment in which they had lived with their mother before they were placed with DHS.
¶ 6. The hearing was rescheduled for February 5, 2007 because the chancellor recused herself due to a conflict of interest. At the hearing on February 5, 2007, J.C.N.F. was present, but was not represented by counsel. The chancellor, however, decided to proceed because the guardian ad litem stated that it would be in the best interest of the children to do so. At the conclusion of the hearing, the chancellor terminated the mother's parental rights. The chancellor also signed a Judgement [sic] Termination Parental Rights, which was presented to him by the DHS attorney at the close of the hearing. Although the chancellor signed the judgment, he crossed off the paragraph stating that parental rights were being terminated on the basis of the substantial erosion of the parent-child relationship pursuant to Mississippi Code Section 93-15-103(3)(f). The Judgment states that parental rights were terminated based on the other grounds cited in the petitionSection 93-15-103(3)(d)(i)-(ii), (e)(i)-(ii), and (h). Miss.Code Ann. § 93-15-103(3) (Rev.2004). The mother timely appealed to this Court.

ANALYSIS
¶ 7. The mother raises two issues on appeal. The first is that the chancellor should have appointed counsel to represent her at the termination hearing or, in the alternative, granted a continuance so that she could obtain counsel. The second is that there was no clear and convincing evidence to support the termination of her parental rights. Because the second issue is potentially dispositive of this appeal and because the analysis of the second issue affects the treatment of the first, we address the second issue first.

I. Whether the Chancery Court Erred in Terminating Parental Rights.
¶ 8. The mother argues that the chancellor erred in terminating her parental rights because termination was not supported by clear and convincing evidence. She claims that the chancellor relied on inadmissible hearsay, which comprised much of the testimony. She also asserts that the chancellor should not have signed the judgment, which had been prepared by DHS and closely resembled the petition, because it is not entirely consistent with the chancellor's conclusions on the record at the termination hearing.
¶ 9. DHS asserts that the testimony that the mother characterizes as hearsay falls under hearsay exceptions, and that, even if the testimony were inadmissible, her argument must fail because the chancellor had clear and convincing evidence before him to terminate her parental rights under Mississippi Code Section 93-15-103(3)(d)(i)-(ii), (e)(i)-(ii), and (h). Miss. Code. Ann. § 93-15-103(3) (Rev.2004).
¶ 10. It is well-established that this Court will affirm a chancellor's findings of fact if there is substantial credible evidence to support them, unless there is manifest error. J.P. v. S.V.B., 987 So.2d 975, 978-79 (Miss.2008) (citations omitted); *766 K.D.F. v. J.L.H., 933 So.2d 971, 975 (Miss. 2006) (citations omitted). This standard of review is highly deferential to the chancellor, who has the opportunity to hear all the testimony and observe the demeanor of all the witnesses firsthand.
¶ 11. The Legislature has identified certain grounds for the termination of parental rights. Miss.Code Ann. § 93-15-103(3) (Rev.2004). Mississippi Code Section 93-15-103(3) states, in relevant part:
Grounds for termination of parental rights shall be based on one or more of the following factors:....
(d) When the child has been in the care and custody of a licensed child caring agency or the Department of Human Services for at least one (1) year, that agency or the department has made diligent efforts to develop and implement a plan for return of the child to its parents, and:
(i) The parent has failed to exercise reasonable available visitation with the child; or
(ii) The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan so that the child caring agency is unable to return the child to said parent; or
(e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent's care and custody:
(i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child; or
(ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent; or....
(h) The child has been adjudicated to have been abused or neglected and custody has been transferred from the child's parent(s) for placement pursuant to Section 43-15-13 and a court of competent jurisdiction has determined that reunification shall not be in the child's best interest.
Miss.Code. Ann. § 93-15-103(3) (Rev. 2004).
¶ 12. This Court established a two-prong test for the termination of parental rights in Petit v. Holifield, 443 So.2d 874, 877 (Miss.1984). In Holifield, this Court stated that "[i]n order to sever the rights of a natural person," a petitioner must first show by clear and convincing evidence that "the objecting parent has either abandoned or deserted the child or is mentally or morally or otherwise unfit to rear or train the child." Holifield, 443 So.2d at 877 (citation omitted). If a petitioner can make such a showing, then "the best interest of the child is to be considered." Id. (citation omitted).
¶ 13. Mississippi Code Section 93-15-103(3) states that any one factor listed can justify the termination of parental rights. Miss.Code Ann. § 93-15-103(3) (Rev.2004). Mississippi Code Section 93-15-103(3)(h) consists of three components. First, it requires that the subject child have been adjudicated abused or neglected. Miss. Code Ann. § 93-15-103(3)(h) (Rev.2004). Second, it requires that the child have been placed pursuant to Mississippi Code Section 43-15-13, which governs the placement of children in foster care and relative care by DHS by order of the youth court. Miss.Code Ann. § 93-15-103(3)(h) (Rev. *767 2004); Miss.Code Ann. § 43-15-13 (Supp. 2008). Third, it requires that a court of competent jurisdiction have determined that reunification is not in the best interest of the child. Miss.Code Ann. § 93-15-103(3)(h) (Rev.2004).
¶ 14. At the termination hearing, DHS presented the following evidence relevant to Section 93-15-103(3)(h). The children were adjudicated neglected by the Stone County Youth Court on April 13, 2005. The Stone County Youth Court ordered that the children be placed in DHS custody on March 3, 2005. And the children have since been placed with relatives and in foster care arrangements. Thus, the first two requirements are satisfied.
¶ 15. Although the record does not include an order, judgment, or decision from the youth court stating whether or not reunification would be in the best interest of the children, there was testimony from the DHS social worker and supervisor regarding the hearing in which the youth court recommended that parental rights be terminated. When questioning the social worker, the guardian ad litem referenced the "TPR [that] was ordered by the youth court last year," and confirmed with the social worker that the date of that hearing was May 3, 2006. The DHS attorney asked the DHS supervisor "when termination was ordered or recommended," and the supervisor responded that she did not recall the exact date, but that it was at the youth court hearing. Implicit in a recommendation that parental rights be terminated is the belief that reunification is not in the best interest of the child. Also, the youth court has exclusive original jurisdiction over matters concerning neglected children. Miss.Code Ann. § 43-21-151 (Rev.2004). Hence, there is substantial evidence that the third requirement of Section 93-15-103(3)(h) is met.
¶ 16. At the conclusion of the hearing, the chancellor expressed his agreement with the recommendation of the Stone County Youth Court that parental rights be terminated. The chancellor read Mississippi Code Section 93-15-103(3)(h) into the record and then stated:
Therein lies the biggest problem for me so far. I am not convinced that reunification with the mother is in the best interest of these children. I have no doubt that the mother wants the children reunited with her. I think the children have a lot of issues that are very serious.... [B]ased on the laws of the State of Mississippi and the decisions or the conclusions that have been reached by the guardian ad litem, by DHS, by the youth court, all confirm that it's not in the children's best interest to be reunited with their mother and they must just get on with their lives.
¶ 17. Because of the highly deferential standard of review applicable in this case, this Court concludes that the chancellor did not err in finding that parental rights should be terminated on the basis of Section 93-15-103(3)(h). Since this Court finds that the chancellor's finding as to the first prong in Holifield was proper, we must determine whether or not there is substantial evidence to support the view that the best interest of the children favors termination. Holifield, 443 So.2d at 877.
¶ 18. The testimony revealed that the children would benefit from the termination of parental rights and a permanent living arrangement. During the examination of the DHS social worker by the DHS attorney, the following took place:
Q: How are [the children] doing at their current foster care?
A: [J.L.N.] is doing okay. He has ups and downs. He really has a lot of ups and downs, but overall he is doing well in this placement, better *768 than in other placements. [E.D.F.] is doing very well. She has thrived. She makes excellent grades and she does very well in her placement.
Q: How were they doing before they were placed in their foster care?
A: I believe there was very little stability in their lives.... I looked at school records for both of the children. They moved several times in the course of one school year. I believe that it was noted that [J.L.N.], in his first grade of school, he moved four different times to four different elementary schools. As with [E.D.F.], she was moved two or three different times during that school year. There was no stability.
When asked how the children would benefit from the termination of the mother's parental rights, the social worker stated "I believe it would bring closure to them, [E.D.F.], especially.... She can't move forward until there is some closure. And I believe the same is true of [J.L.N.]. If there is a definite [sic] on his part he would be able to move forward and grow." When the DHS supervisor was asked how the children would benefit from termination of parental rights, she responded:
I have worked with these children. I have talked to these children. [E.D.F.] approached me at a Christmas party and said, Ms. Denise, I want to be adopted, what do I have to do. I've had to explain to her what would have to happen and that it wasn't just an overnight process.
[J.L.N.], on the other hand, he started off with, I don't want to go back there to live. My mom has had chances. She's continued to do this. I just want to go on with my life. But as time has progressed and he's kind of went into a residential treatment facility where he's restricted in what he can do, then he kind of flip-flops because he sees if he goes back to his mom's, he can go back to doing whatever he wanted to do, which is what he was doing when he was here.
Because according to the children, mom would be asleep for long periods of time. They basically watched what they wanted to on TV, played what they wanted to, and did whatever they wanted to do at that time.
There was also testimony regarding J.L.N.'s behavioral problems. The DHS social worker testified that there were two attempts to place the children with relatives. Both times the placement failed at least in part because of the behavioral problems of J.L.N. These sentiments are echoed in the guardian ad litem report.
¶ 19. As for the mother's situation at the time of the hearing, the testimony shows that she was unemployed, that she voluntarily took care of other people's children at their homes, and that, at the time of the hearing, she had taken a month off from babysitting. She stated that she had previously attempted to obtain a GED, but was not, at the time of the hearing, actively enrolled in any classes. She testified that although she had filed for disability benefits, she had not yet received any benefits. The mother also stated that she has various health problems, including a heart valve problem, tumors, a ruptured disc, and low blood pressure. The testimony indicated that she has had serious struggles with her mental health (she suffers from bipolar affective disorder and depression) and prescription drugs. Furthermore, of the thirteen tasks she was assigned pursuant to the Service Agreement, the testimony revealed that she was unable to complete eight of the tasks, including submitting to and obtaining negative results from random drug testing, *769 counseling, submitting to a psychological examination, and keeping DHS aware of her whereabouts and contact information. In addition, she was unable to meet any of the overall goals set out in the Service Agreement.
¶ 20. This Court finds that the chancellor did not commit manifest error in finding that the best interest of the children would be served by terminating parental rights so that they could be placed in a permanent living situation. Holifield, 443 So.2d at 877. The record shows that the children lived in a difficult home environment when they were in the care of their mother. The testimony reveals that they moved from school to school and were not properly supervised at home. According to the testimony, the children have fared better in their foster placements, but E.D.F. wishes to be adopted, and J.L.N. would likely benefit from a more permanent adoptive setting as well. The testimony reflects that, while J.C.N.F. clearly cares very much for her children and wishes to be a good mother, she is currently unable to provide a stable home environment for E.D.F. and J.L.N. because of her lack of employment and personal health issues.
¶ 21. This Court finds that the chancellor in this case considered the best interest of the children. Since the two prongs of the Holifield test are met, we cannot say that the chancellor's decision to terminate parental rights was unsupported by substantial, credible evidence.
¶ 22. The mother claims that much of the testimony given was inadmissible hearsay, and therefore could not be relied upon as clear and convincing evidence in support of terminating parental rights. However, there is substantial, nonhearsay evidence in support of one of the grounds for terminating parental rights. Therefore, the question of whether or not hearsay pertaining to other grounds for termination was erroneously admitted is irrelevant.
¶ 23. The mother also raises an argument concerning the validity of the judgment signed by the chancellor because it was prepared by DHS. She correctly asserts that the language in the judgment is essentially identical to the language in the petition to terminate parental rights. However, this Court finds that whatever error the chancellor may have committed by signing the judgment as drafted by DHS is harmless because there is substantial, credible evidence supporting the termination of parental rights pursuant to Section 93-15-103(3)(h).
¶ 24. Because this Court finds that there is substantial, credible evidence in support of termination under Section 93-15-103(3)(h), and because Section 93-15-103(3) only requires one factor as grounds to terminate parental rights, the other grounds for termination need not be addressed.

II. Whether Due Process Requires the Appointment of Counsel.
¶ 25. The mother also argues on appeal that due process required that counsel be appointed to represent her at the termination-of-parental-rights hearing. Because the chancellor did not appoint counsel to represent her, she asserts that the chancellor erred. She cites Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) and K.D.G.L.B.P. v. Hinds County Department of Human Services, 771 So.2d 907 (Miss.2000) in support of her argument. Alternatively, she claims that the chancery court should have granted her a continuance so that she could obtain an attorney to represent her.
¶ 26. DHS contends that the mother was not entitled to appointed counsel because *770 the presence of counsel would not have altered the outcome of the hearing. DHS also states that the decision to grant or deny a continuance falls within the discretion of the chancery court. DHS claims that the chancellor did not abuse his discretion by failing to grant a continuance given that it was in the best interest of the children to proceed with the hearing and because the mother had five months in which to obtain an attorney for the hearing.
¶ 27. This Court proceeds de novo if the chancellor "has misapprehended the controlling rules of law or has acted pursuant to a substantially erroneous view of the law." S.N.C. v. J.R.D., 755 So.2d 1077, 1080 (Miss.2000); see also Dunbar v. Renfroe, 876 So.2d 308, 312 (Miss.2004) ("[T]he chancery court's interpretation and application of the law is reviewed under a de novo standard."); C.T. v. R.D.H., 843 So.2d 690, 706 (Miss.2003) ("[W]e apply a de novo standard of review on questions of law"). The issue presented here is whether due process, in a particular case, requires that counsel be appointed for an indigent parent in a termination of parental rights hearing. This is a question of law and we review de novo.
¶ 28. In Lassiter, the Supreme Court weighed the Mathews procedural due process factors for the termination of parental rights "against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty." Lassiter, 452 U.S. at 27-32, 101 S.Ct. 2153 (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976)). The Supreme Court concluded that the Constitution and due process do not require the "appointment of counsel in every parental termination proceeding," and that the right to counsel for indigent parents in termination proceedings must be decided on a case-by-case basis. Lassiter, 452 U.S. at 31-32, 101 S.Ct. 2153. The Supreme Court indicated that the trial court must make this decision in the first instance and that the trial court's decision is subject to appellate review. Id. at 32, 101 S.Ct. 2153. In Lassiter, the Supreme Court found that the parent was not entitled to the appointment of counsel because the case did not involve 1) "allegations of neglect or abuse upon which criminal charges could be based;" 2) expert witness testimony; or 3) "specially troublesome points of law, either procedural or substantive." Id. The Supreme Court concluded that the presence of counsel would not have resulted in a determinative difference and that the trial court did not err by failing to appoint counsel for the parent. Id. at 32-33, 101 S.Ct. 2153.
¶ 29. In K.D.G.L.B.P., this Court found that the parent was not entitled to the appointment of counsel and had received a "fair and adequate hearing." K.D.G.L.B.P., 771 So.2d at 911. This Court applied the Supreme Court's decision in Lassiter to the facts of the case and found that the parent had "ample notice" of the hearing such that she could have obtained counsel, that she never requested a continuance or additional time to obtain counsel, that she never mentioned that she was indigent, and that the presence of counsel would not have made a determinative difference. Id.
¶ 30. In this case, the Petition to Terminate Parental Rights was filed on August 28, 2006. On September 6, 2006, the chancery court issued a Special Order Setting Case for Trial for December 4, 2006 stating that "[t]he Clerk of this Court will issue process in the time and manner prescribed by law for the Respondent, [J.C.N.F.], to appear and defend at the above specified date, time and place." The hearing was continued from December 4, *771 2006 until February 5, 2007 because the first chancellor had to recuse herself.
¶ 31. At the beginning of the termination hearing on February 5, 2007, the chancellor asked the mother, who appeared without counsel, if she was prepared to proceed. She first responded "[y]es, sir," but when asked again, she stated "I don't know, sir." The chancellor then asked if she planned on representing herself and she said "[n]o, sir." She explained that she had intended to obtain an attorney through a free service, but that there had been a problem. She added that she had been unable to hire an attorney on her own because she depends on Social Security benefits and had been babysitting in order to earn money, but did not have enough money to hire an attorney. However, during the hearing, she testified that she took care of other people's children voluntarily without pay, and had taken time off from babysitting during the month prior to the termination hearing.
¶ 32. The DHS attorney responded that the mother had two months from the December 4, 2006 hearing to obtain an attorney. The chancellor then decided to proceed with the hearing because the guardian ad litem claimed that the best interest of the children would be furthered by proceeding with the hearing, rather than delaying a decision regarding parental rights. The chancellor stated that "I'm going to proceed this morning, because [sic] if it turns out that things are not fair, I will stop it and continue it to a later date."
¶ 33. This Court now turns to the guideposts provided by the Supreme Court in Lassiterwhether the hearing involved potentially criminal allegations of neglect or abuse, expert testimony, or troublesome points of law. Lassiter, 452 U.S. at 32, 101 S.Ct. 2153. The petition alleges in part that "[t]here is a substantial erosion of the relationship between the Minor Petitioners and the Respondent, [J.C.N.F.], which was caused at least in part by said Respondent's serious abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate constituting grounds for termination of her parental rights." (Emphasis added). Based on these allegations, the mother could be prosecuted pursuant to Mississippi Code Section 97-5-39(1). Miss.Code Ann. § 97-5-39(1) (Rev.2006) (stating that willful acts or omissions of the accused resulting in the neglect, delinquency, or abuse of a child is a misdemeanor punishable by a fine of up to $1,000 or imprisonment for up to one year; further stating that if the neglect of the child results in substantial harm to the child's health, the accused may be fined up to $5,000 or imprisoned for up to five years).
¶ 34. On the other hand, the case did not involve expert testimony, nor did it involve "specially troublesome points of law." Lassiter, 452 U.S. at 32, 101 S.Ct. 2153. Also, this Court finds that the presence of counsel would not have made a determinative difference, although it may have greatly changed the hearing transcript now before this Court. See id. at 33, 101 S.Ct. 2153; K.D.G.L.B.P., 771 So.2d at 910-11. An attorney would have been able to present the mother's testimony in a more persuasive manner or object to inadmissible evidence, but one of the bases on which the chancellor terminated parental rights would remain unaffected by the presence of counsel. In other words, this Court cannot say that the presence of an attorney would have precluded the chancellor from finding that parental rights should be terminated based on Mississippi Code Section 93-15-103(3)(h). An attorney could not have refuted the fact that the children had been adjudicated neglected, that they had been placed with *772 DHS pursuant to Section 43-15-13, and that the youth court had recommended that parental rights be terminated. Those occurrences had already taken place prior to the termination hearing, and an attorney could not have changed the factual history of the case.
¶ 35. Moreover, this Court notes that the mother had four or five months in which to find a legal services organization to represent her or to raise funds to hire an attorney. She was fully aware of the pending proceeding, and was certainly aware of the fact that her children had been in DHS custody for more than one year. She appeared at numerous hearings, including the termination hearing at issue, in which she actively participated and attempted to represent herself, to object to the admission of evidence, and to question witnesses. The chancellor also made efforts to assist the mother by examining witnesses when she was unable to do so, as well as directing her own testimony when she was unable to present a persuasive case for the return of her children.
¶ 36. Based on Lassiter and K.D.G.L.B.P., this Court concludes that J.C.N.F. was not unconstitutionally deprived of counsel or of due process. Lassiter, 452 U.S. 18, 101 S.Ct. 2153; K.D.G.L.B.P., 771 So.2d 907.
¶ 37. The mother also argues that the chancellor should have granted a continuance so that she could obtain an attorney.[1] This Court reviews a trial court's decision to grant or deny a continuance for an abuse of discretion and will only reverse if manifest injustice resulted from the decision. Jacobs v. State, 870 So.2d 1202, 1205 (Miss.2004) (citation omitted). There is nothing in the record to indicate that the mother deserved a continuance or that she would have been able to secure counsel had she been granted a continuance. Again, she had four or five months' notice of the termination proceeding. Furthermore, it appears that she faced a similar situation in youth court in 2005. The Disposition Order from the youth court dated April 14, 2005 states that
[J.C.N.F.] was advised of her right to and the need to obtain legal counsel at the Shelter hearing on March 4, 2005, and ... [she] was granted a continuance March 23, 2003, in order to obtain counsel, and ... [she] has not retained counsel after having adequate time and notice to do so.
The youth court then proceeded with the disposition hearing.
¶ 38. Based on the best interest of the children, the length of time during which J.C.N.F. could have obtained an attorney, and the fact that she had problems obtaining counsel for youth court hearings, this Court cannot find that the chancellor abused his discretion in deciding to proceed with the termination hearing. We also cannot say that a manifest injustice resulted from the failure to grant a continuance.

CONCLUSION
¶ 39. This Court concludes that the chancellor did not err by finding clear and convincing evidence in support of terminating J.C.N.F.'s parental rights under Mississippi Code Section 93-15-103(3)(h). This Court further holds that the chancellor did not err by failing to appoint counsel for J.C.N.F. or by failing to grant a continuance for her to obtain counsel. Accordingly, *773 this Court affirms the chancellor's decision to terminate parental rights.
¶ 40. AFFIRMED.
WALLER AND DIAZ, P.JJ., CARLSON, RANDOLPH AND LAMAR, JJ., CONCUR. DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY, J. SMITH, C.J., NOT PARTICIPATING.
DICKINSON, Justice, Dissenting.
¶ 41. My deep respect for the majority notwithstanding, I must dissent. The majority cites much federal authority to support its position. I do not quarrel with that authority, and I recognize that the mother's parental rights may very well need to be terminated. Nevertheless, I must humbly confess that I do not understand how our legal system can purport to guarantee due process of law to this indigent mother of two children, and then allow the State to terminate her parental rights at a hearing wherein she requested but was not afforded legal representation. Wealth should never be a criterion to defend motherhood. Further analysis would be futile since the judicial proclamations I might present pale in comparison to the inherent unfairness of what happened here. I therefore respectfully dissent.
EASLEY, J., Joins this Opinion.
NOTES
[1] While the mother claims on appeal that she requested a continuance, the transcript of the hearing does not support this claim.