# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CA-01805-SCT

*RACHEL COULTER*

*v.*

*SHANNON DUNN AND DONNA DUNN*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/07/2019 |
| TRIAL JUDGE: | HON. DAVID SHOEMAKE |
| TRIAL COURT ATTORNEYS: | MARY LEE HOLMES |
| | MARCUS ALAN McLELLAND |
| | APRIL TAYLOR BRYANT |
| COURT FROM WHICH APPEALED: | JEFFERSON DAVIS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MARY LEE HOLMES |
| | MARCUS ALAN McLELLAND |
| ATTORNEY FOR APPELLEES: | APRIL TAYLOR BRYANT |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 03/04/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1. Rachel Coulter appeals a judgment by the chancery court of Jefferson Davis County terminating her parental rights. She challenges the chancellor's finding of fact that she was the custodial parent of her daughter when her daughter was abused and its conclusion of law that responsibility for abuse can be imputed to custodial parents. We affirm a chancellor's findings of fact provided there is credible evidence to support the findings and the findings

are without manifest error. *J.C.N.F. v. Stone Cnty. Dep't of Hum. Servs.*, 996 So. 2d 762, 765 (Miss. 2008) (citing *J.P. v. S.V.B.*, 987 So. 2d 975, 978–79 (Miss. 2008); *K.D.F. v. J.L.H.*, 933 So. 2d 971, 975 (Miss. 2006)). "This standard of review is highly deferential to the chancellor, who has the opportunity to hear all the testimony and observe the demeanor of all the witnesses firsthand." *Id.* at 766. Having examined the chancery court's judgment and the record presented to this Court, we find that the judgment is supported by ample evidence and is legally sound. Thus, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

¶2. D.G.E.C. was born on June 1, 2016. Her biological parents were Rachel Coulter and Cody Jones. Coulter and Jones never married. On the evening of August 6, 2016, Jones took the nine-week-old baby to a room in their two-bedroom trailer to change her diaper. He noticed that her leg appeared limp. He told Coulter "her leg flopped over like it had no life in it" and expressed concern that it was broken. Eventually, Coulter and Jones took the baby to an emergency room.

¶3. Coulter suggested that the baby might be suffering due to a reaction to her first round of vaccinations received three days earlier. X-rays of the leg revealed that it was fractured. The baby was transferred to University of Mississippi Medical Center (UMMC) for further evaluation and treatment. Upon admission to UMMC, medical professionals identified bruising to the baby's forehead and cheek, acute posterior rib fractures on both sides of her chest, lateral rib fractures, an intertrochanteric femur fracture or hip fracture, corner fractures above and below both knees, and left ankle fractures.

2

¶4.    Given the baby's medical condition upon admission, a UMMC social worker contacted the Jefferson Davis County Department of Human Services (DHS) to report the injuries. When the baby was discharged, she was placed by the DHS in the custody of her paternal grandparents, Shannon and Donna Dunn. The baby has resided with the Dunns since her discharge from UMMC more than four years ago.

¶5.    In September of 2016, the Jefferson Davis County Youth Court adjudged the baby to be a neglected child. The court transferred custody to the Dunns, and entered a no-contact order against Coulter.  In November of 2016, the Dunns filed a petition for guardianship of the baby in the chancery court of Jefferson Davis County. At that time, the youth court transferred the matter to chancery court.

¶6.    In May of 2017, the Dunns were appointed temporary guardians, and Coulter was granted supervised visitation. The visitation order was subsequently modified at the request of both parties. In November of 2018, the Dunns filed a complaint for termination of parental rights against Coulter and Jones. In January of 2019 a guardian ad litem was appointed. The chancery court held a hearing in September of 2019 and issued its judgment terminating the parental rights of Coulter and Jones on November 7, 2019. Only Coulter appeals.

**ANALYSIS**

**I.    Termination of Parental Rights in Mississippi**

¶7.    Mississippi Code Section 93-15-119 addresses some grounds for termination of parental rights. It includes, inter alia, that the parent "is mentally, morally, or otherwise unfit to raise the child, which shall be established by showing past or present conduct of the parent

that demonstrates a substantial risk of compromising or endangering the child's safety and welfare[.]" Miss. Code Ann. § 93-15-119(1)(a)(i) (Rev. 2018). Such conduct must be established by clear and convincing evidence. *Id.* If a court finds such and it determines that "reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome[,]" then parental rights may be terminated. Miss. Code Ann. § 93-15-119(1)(a)(ii) (Rev. 2018).

## II. The Chancery Court's Findings

### A. Abuse

¶8. Relying on the testimony of Dr. Scott Benton, who was also a treating physician along with others, the chancery court found clear and convincing evidence that the baby was abused in the nine weeks between birth and hospitalization. Dr. Benton is a pediatrician and was, at the time of the trial, the only certified child-abuse pediatrician in the state of Mississippi. Dr. Benton examined the child and her medical records shortly after she was admitted to UMMC. He testified that the baby had sustained multiple rib fractures, bruising to the forehead and cheek, a hip fracture, knee fractures, a tibia fracture, and ankle fractures.

¶9. Benton characterized the knee and ankle fractures as corner fractures and stated, "a corner fracture is a very unique fracture in childhood. In fact, it only occurs in childhood. It occurs when the ankle or the knee is grabbed. It has to be jerked and twisted simultaneously in order to cause these fractures." Benton further testified that the hip fracture should have immediately alerted a caretaker to the baby's predicament "because they could feel and hear the bones break." The hip fracture required "a blow at the fracture site and it has got to be

4

a very powerful blow, like a kick or a punch. So even though it's a little baby, that bone is strong, it is big . . . . As a bone breaks it makes a snap and then you can feel it."

¶10.   Dr. Benton was asked to date the injuries. He testified that he and the treating orthopedist and radiologist jointly concluded that the hip fracture "would be less than seven days old" from the date of admittance to UMMC.  Dr. Benton testified that the injuries were caused by the dangerous behavior of an individual knowingly, recklessly, or negligently harming a child. He also testified that any repetition of the behavior that caused these "high-force injuries" could prove fatal. The chancellor found that the baby was the victim of abuse.

### B.    Custody

¶11.   The chancellor also found, based on Coulter's testimony, that Coulter was the custodial parent of the baby at the time of the most significant abuse, the hip fracture. Coulter testified that she had left the baby with multiple people[1] during the baby's first weeks as a

---

[1] Coulter was cross-examined by counsel for the Dunns and the following colloquy ensued:

[Counsel]: So from June the 1st until she was admitted into the hospital on August the 6th, you were the primary caregiver?

[Coulter]: Yes, ma'am.

[Counsel]: And who did you leave [the baby] with without you being present during those weeks?

[Coulter]: From the time she was born until?

[Counsel]: August the 6th.

[Coulter]: My cousin Charity McLendon, my mother, my father, my grandfather, Cody, and my sister. But my sister was with Cody whenever I left her alone with Cody.

newborn. But Coulter also testified she never left the baby alone with anyone in the week leading up to the hospital admittance, the week to which Dr. Benton dated the hip fracture.[2]

¶12. The chancery court held that our law allows a fact-finder to infer responsibility for abuse from circumstantial evidence, such as an inference that the individuals who had custody of a child at the time the abuse occurred bear responsibility for the abuse. *See Aldridge v. State*, 398 So. 2d 1308, 1310–11 (Miss. 1981) ("There is no fact or circumstance in evidence tending in any way to support any other reasonable explanation of these injuries except that they were inflicted by its parents. No other person is shown to have had the

---

[2] After being confronted with an earlier interrogatory response, Coulter modified her testimony on cross-examination:

[Counsel]: But if these were the dates that you put on your interrogatories back in 2017, and then you put them on again in 2019, the same exact dates, you would say that these are accurate dates?

[Coulter]: Yes, ma'am.

[Counsel]: So from July the 27th until August the 6th you did not leave her alone with anybody else?

[Coulter]: It was just me, my sister, and Cody are the only ones that were around her during that time.

[Counsel]: But you would have been present at all times?

[Coulter]: Yes, ma'am, if not in the same house or, you know in another room, but I was still present under the same roof.

. . . .

[Counsel]: But you never left her alone with them, you were always present?

[Coulter]: Yes, ma'am.

6

custody or care of the infant save [the child's] parents."); ***Carson v. Natchez Children's Home***, 580 So. 2d 1248, 1258 (Miss. 1991) ("The degree of knowledge and participation by Carson in these aberrant practices is not, and may never be known. . . . [N]o mother should be permitted to have custody or control of any children if she permits one child to be molested as was done to Debbie."); ***In re D.O.***, 798 So. 2d 417, 422 (Miss. 2001) ("Here as in **Aldridge**, no evidence was presented showing anyone had custody of T.O. save her parents."). The learned chancellor found clear and convincing evidence that Coulter had custody of the baby at the time abuse occurred. As a matter of law, the chancellor imputed responsibility for the abuse to Coulter. We find no error in this determination.

### C.    Reunification Undesirable

¶13.    The chancellor further found that reunification with Coulter was undesirable and would be against the best interests of the child. During the then-three years that D.G.E.C. had been in the custody of the Dunns, Coulter "offered only minimal and insignificant support." The court specifically noted Coulter provided very little in the way of food, clothing, shelter, medical care, or other support to the child despite claiming the child as a full-time dependant on her tax returns. The chancellor also adopted the findings of the guardian ad litem that Coulter has failed to offer any "logical explanation" for her failure to recognize that her daughter was in immense pain and failed to seek medical attention until some of the fractures were already healing.[3] The guardian ad litem reported that the child was happy, healthy, and

---

[3] Coulter did not name any suspected abuser of D.G.E.C. or offer proof of any while she was under oath before the chancery court. Now, for the first time on appeal, she levies accusations against Cody Jones, claiming he is the likely abuser. Because this was not presented to the chancery court, we decline to address Coulter's arguments. *See **Gordon v.***

7

well cared for by her grandparents with no further abuse. The court adopted the recommendation of the guardian ad litem that "it is in the best interest of the minor, based on the totality of the circumstances, to terminate the parental rights of Rachel Coulter and that such termination is appropriate because reunification between mother and child is not desirable toward obtaining a satisfactory permanency outcome." Accordingly, the court held that

> because of her self-described position as the custodial parent of [the child], [Coulter] committed or permitted someone else to commit a series of abusive acts toward her infant child which, taken in totality, make future contacts between mother and child undesirable and which demonstrated for this Court a substantial risk of endangering the child's safety and welfare.

The chancellor terminated Coulter's parental rights.

## II.     Coulter's Challenges

¶14.    Coulter challenges both the chancery court's finding of fact that she was the custodial parent at the time of the abuse and the chancery court's legal conclusion that responsibility for abuse sustained by a child while in the custody of a parent may be imputed to that parent.

### A.     Coulter's Factual Arguments

¶15.    Coulter argues, "[t]he trial court seems to have unfairly accepted The [sic] Dunns' attempts to characterize Rachel as being the only person around D.G.E.C. during those first few months." Such representations, though, are at odds with Coulter's own testimony. While other individuals may have been around the child, Coulter was by her own admission always there, always watching, always monitoring her child when the most visible and significant

---

*Wall (In re Will of Waller)*, 273 So. 3d 717, 721 (Miss. 2019) (quoting *Brown v. Miss. Transp. Comm'n*, 749 So. 2d 948, 954 (Miss. 1999)).

abuse was perpetrated on her child.[4]

¶16. Considering the reprehensible injuries sustained by this child, no question exists that the baby was abused. The chancellor was correct in so finding. Coulter's own words establish that she had custody when her daughter sustained these injuries. We find no error in the chancellor's holding that clear and convincing evidence supported his findings.

### B.    Coulter's Legal Arguments[5]

¶17. Coulter next assails the case law undergirding the chancellor's decision to impute responsibility for the abuse to her as the custodial parent. Coulter argues *In re D.O.* is factually distinguishable from the case sub judice. While the specific facts of *In re D.O.* differ, Coulter's argument fails to appreciate the reasoning employed by the *In re D.O.* court. In that case, this Court relied on *Aldridge* to reaffirm that when evidence establishes that only the parents of a child who is abused have custody of the child, it can be inferred that the parents bear responsibility for the abuse sustained by the child. *In re D.O.*, 798 So. 2d at 422.

---

[4] Coulter also testified that the day the baby was brought to the emergency room, she brought the baby to her mother. Coulter testified that she left the baby there for several hours while she mowed the lawn at her trailer. This directly contradicts her testimony excerpted in footnote 2. We note that it is not the role of appellate courts to "reweigh evidence," "assess the witnesses' credibility," or "resolve conflicts between evidence." *Little v. State*, 233 So. 3d 288, 289 (Miss. 2017). Given the deferential standard accorded chancery courts, we only ask if there is sufficient evidence to support a holding, not if testimony is unanimous on a given point. *See G.Q.A. v. Harrison Cnty. Dep't of Hum. Res.*, 771 So. 2d 331, 335 (Miss. 2000). Evidence established that the most serious fracture did not occur the day the baby was taken to the hospital.

[5] Coulter argues that medical records were improperly admitted by the chancery court. She claims the records "failed to include a certificate as required" by Mississippi Rule of Evidence 902(11). An examination of the record reveals an affidavit meeting the requirements of Rule 902(11) attached to the medical records.

We reject Coulter's invitation to abandon this principle.

¶18.    Coulter next argues that ***Aldridge*** "should not be read to mean that merely because a parent is the primary caregiver of a child, the parent should be held responsible if another individual abuses that child." Coulter's argument fails to address this Court's conclusion in ***Aldridge***. In ***Aldridge***, this Court held that despite an absence of direct evidence of abuse, logically, when a child is abused and the evidence establishes that only the parents had custody of the child and that "[n]o other person is shown to have had the custody or care of the infant save its parents[,]" the parents can be held to account for the abuse of the child. ***Aldridge***, 398 So. 2d at 1311.[6]

¶19.    Coulter's testimony established that when the baby sustained the most serious fracture, Coulter was present. Accepting that the evidence before the chancery court established that

_____

[6] In ***Aldridge*** we stated:

> Dr. Curry's testimony as to the nature of the fractures strongly tended to refute the explanation given him by the appellants as to how the fractures occurred. The other medical testimony as to some five additional fractures shown by x-rays of the infant revealed by their varying degrees of healing that they were inflicted over a comparatively short period of time and justified a finding that they were the results of a course of mistreatment extending over almost the entire brief life span of the child. There is no fact or circumstance in evidence tending in any way to support any other reasonable explanation of these injuries except that they were inflicted by its parents. No other person is shown to have had the custody or care of the infant save its parents. To sustain a verdict based on circumstantial evidence it is not necessary that such evidence exclude every possible doubt or theoretical supposition in no way related to the facts or circumstances of the case. It is enough that such evidence exclude every reasonable hypothesis of innocence. ***Andrews v. State***, 237 Miss. 875, 116 So. 2d 749 (1960).

***Aldridge***, 398 So. 2d at 1310–11.

the baby was abused, responsibility for the abuse can be imputed to Coulter. The abuse created "a substantial risk of compromising or endangering" the baby's health and safety. Miss. Code Ann. § 93-15-119(1)(a)(i) (Rev. 2018). That finding, coupled with the undesirability of reunification, is a sufficient ground to terminate Coulter's parental rights under Mississippi Code Section 93-15-119.

## CONCLUSION

¶20. Having scrutinized the record and having accorded deference to the chancellor's decision, this Court holds that the chancery court's findings of fact and conclusion of law were supported amply by the evidence and case law. Accordingly, we affirm.

¶21. **AFFIRMED.**

**KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**