# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CP-00704-COA

**CARNELL GREEN**                                                    **APPELLANT**

**v.**

**POIRRIER PROPERTIES L.L.C. AND**                        **APPELLEES**
**POIRRIER FARMS, INC.**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/26/2021 |
| TRIAL JUDGE: | HON. DEBBRA K. HALFORD |
| COURT FROM WHICH APPEALED: | AMITE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | CARNELL GREEN (PRO SE) |
| ATTORNEY FOR APPELLEES: | CHRISTOPHER ERIC KELLEY |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 08/02/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., GREENLEE AND LAWRENCE, JJ.

### GREENLEE, J., FOR THE COURT:

¶1.     Carnell Green appeals from the judgment of the Amite County Chancery Court in favor of Poirrier Properties L.L.C. and Poirrier Farms, Inc. (Poirrier).  We affirm the chancellor's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2.     In August 2013, Poirrier filed a complaint against Green and several other defendants alleging that on or about September 19, 2012, the defendants entered on its property in Amite County without right, title, or consent and cut down, deadened, destroyed, and took away timber without consent.  Poirrier later stipulated that the only interested parties in the matter before the chancellor were Poirrier and Green.  According to a survey, Poirrier's property in

Amite County was adjacent to Green's property in Wilkinson County. Green's property was located to the west of a creek that ran from north to south, and Poirrier's property was situated to the east. A portion of timber ran along both sides of the creek. The timber (totaling approximately 5 acres) and land on which the timber was situated was in dispute. Most of the disputed timber was on the southwestern side of the creek, and a smaller portion of timber was located on the northeastern side of the creek. Throughout the proceedings in the chancery court, the parties also seemingly disputed the exact location of the Amite/Wilkinson county line, which was ultimately established as the boundary line dividing the two properties.

¶3.    Green filed an answer denying the allegations in the complaint and later filed an amended answer and counterclaim. In his counterclaim, Green asserted that his property line extended to a fence that had been erected decades earlier and suggested that the disputed timber was located on his side of the fence. Green also suggested that he had acquired title to the property on which the disputed timber was situated by adverse possession. Green asked the chancellor to prevent Poirrier from asserting any right, title, or estate of any nature to the property and asked the chancellor to permanently enjoin Poirrier from trespassing on the property.

¶4.    In February 2019, Poirrier filed an amended complaint in which it asserted a timber-trespass claim, asked the chancellor to remove any cloud on title, and asked the chancellor to determine the heirship of Tom and Laura Green (Green's parents) to ensure that all necessary parties were before the court.

¶5. In April 2021, the chancellor held a hearing. Poirrier called several witnesses, including Green (who was called as an adverse witness). Green testified that his parents purchased the property in Wilkinson County decades earlier and that throughout the years the property had been used for farming, hunting, and fishing. Green suggested that his father had shown him the boundary lines on the property before his death and suggested that the boundary line between his property and Poirrier's property was the Amite/Wilkinson county line. However, Green seemingly believed that no portion of Amite County extended west of the creek, and therefore Poirrier had no right to the disputed timber or property located west of the creek. Green also believed that a fence on the east side of the creek was located on his property, and therefore Poirrier had no right to the disputed timber or land in that area. Finally, Green suggested that Charlie Floyd, whose property was located to the north of his property, had cut some of his (Green's) timber. However, Green later testified that he showed the timber cutters where to cut and that he received the sale proceeds.

¶6. Dewayne Poirrier testified as a representative on behalf of Poirrier. Dewayne testified that when Poirrier acquired its property, the previous owner told him, "You've got 3 to 5 acres, or something like that, on each side of the creek. I never had it surveyed, but here's your lines." And at that point, they walked the property. Dewayne also testified that when Poirrier acquired the property years earlier, he noticed that all the timber had been cut on Green's property, but none of the timber on the disputed property had been cut. As a result, Dwayne testified that he believed that Green knew where the boundary line was between

3

their properties and knew that the disputed property was not his.[1]  Additionally, Dewayne testified that he had never seen any evidence of use or possession of the disputed property by anyone other than his family before September 2012.

¶7.    Jeffery Stewart testified as an expert in the field of land surveying and civil engineering.  According to Stewart, Poirrier hired him to "retrace a line"—presumably the Amite/Wilkinson County line.[2]  Stewart testified that he obtained the deeds and survey documents and then went to the field to look for evidence of the original survey.  While conducting the retracing survey, he encountered a "discrepancy."  He explained that two monuments were located approximately 81 feet from where he expected them to be, so he proceeded to "prove those corners."  Ultimately, Stewart seemingly testified that a blue line on his survey—which showed where the county line was located—served as the boundary line between Poirrier's property and Green's property.

¶8.    Finally, Tom Middleton testified as an expert in the field of forestry.  Poirrier hired Middleton to measure and record every stump on the disputed property after the timber had been cut in September 2012.  Middleton testified that the timber growth was relatively uniform.  He explained, however, that he had to make assumptions when calculating the volumes because there were not any trees to observe.  Middleton's valuation report, which was admitted into evidence as Exhibit 19, indicated he calculated that the total amount of

---

[1] During his testimony, Green acknowledged that he had cut timber on one other occasion prior to when the timber was cut in September 2012.

[2] Stewart explained that there were two types of surveys with respect to boundary lines—an original survey and a retracing of the original survey.  Because an original survey had already been completed, he conducted a retracing survey.

damages was $21,826.73. Middleton acknowledged, however, that "[i]f the Poirrier . . . [t]ract constituted 85% of the overall hatched area[, then] . . . 85% of the damages [he] calculated . . . would be the correct amount of damages . . . ."

¶9. After the chancellor denied Green's motion for a directed verdict, Green testified on his own behalf. The chancellor determined that Green's parents died intestate and that Green was one of the "sole heirs at law." Although Green lived in New Orleans from 1965 to 2005, he testified that he visited the property in Wilkinson County every weekend. Green indicated that he had hunted on the disputed property and that his mother fished in the creek all the time before her death. According to Green, he was not "trying to cut any timber . . . that wasn't [his]." Rather, he seemingly believed that his property, or the Amite/Wilkinson County line, extended to the fence line east of the creek.

¶10. Similarly, Charlie Floyd testified that his father told him that the boundary line between the two properties was the fence line. Floyd explained that his father sold property to Tom and Laura Green when he was approximately twelve years old.

¶11. Finally, Green's daughter Gwendolyn testified that she believed the county line, or boundary line, was beyond the fence line. Additionally, she testified that her family and friends hunted and fished on the property and that she had never seen the Poirriers on the property.

¶12. In May 2021, the chancellor entered a written judgment.[3] The chancellor found that Green's property and Poirrier's property adjoined at the Amite/Wilkinson county line and

_____

[3] To avoid redundancy, the chancellor's more detailed bench ruling will be discussed later.

5

that no part of Green's property was in Amite County. Furthermore, the chancellor held that Green failed to prove he had adversely possessed Poirrier's property. Finally, the chancellor rendered a judgment against Green for $18,552.72 and enjoined Green and his heirs, successors, and assigns from entering onto Poirrier's property. From this judgment, Green appealed.

## DISCUSSION

¶13. At the outset, we note that the pro se appellant's brief filed by Green does not comply with our rules of appellate procedure.[4] Mississippi Rule of Appellate Procedure 28(a)(3) requires that the brief of the appellant contain a Statement of Issues that "shall identify the issues presented for review . . . . Each issue presented for review shall be separately numbered in the statement[,]" and "[n]o issue not distinctly identified shall be argued by counsel, except upon request of the court, but the court may, at its option, notice a plain error not identified or distinctly specified." M.R.A.P. 28(a)(3). Although Green includes an issues section in his appellant's brief, he does not actually present any arguable issues within that section. It is only in the conclusion section of his brief that he asserts the chancellor's judgment should be dismissed.[5]

---

[4] In an order dated February 9, 2022, a panel of judges denied Green's pro se motion for the appointment of appellate counsel, noting that except in some cases involving termination of parental rights, *see J.C.N.F. v. Stone Cnty. Dept. of Hum. Servs.*, 996 So. 2d 762, 770 (¶¶28-29) (Miss. 2008), a party in a civil case has no right to appointed appellate counsel. *Reasor v. Jordan*, 110 So. 3d 307, 310 (¶10) (Miss. 2013).

[5] Green asserts that the chancellor's judgment, issued eight years after the complaint was filed, was not based on factual evidence, and that "[the] property where the timber was cut [was] heir property and a witness stated that he cut thirty acres of timber along the fence line." However, it seems that the basis for Green's appeal is his claim that "[b]ased on the

6

¶14. Additionally, Mississippi Rule of Appellate Procedure 28(a)(7) provides that the argument section in an appellant's brief "shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." This Court has held that "when the appellant fails to make a meaningful argument on an issue, the issue is considered waived." *Smith v. Dodd*, 328 So. 3d 772, 775 (¶11) (Miss. Ct. App. 2021) (quoting *Roundstone Dev. LLC v. City of Natchez*, 105 So. 3d 342, 349 (¶34) (Miss. Ct. App. 2011)). Furthermore, "it is the duty of an appellant to provide authority in support of an assignment of error." *Id.* (quoting *Flowers v. Boolos* (*In re Est. of Smith*), 204 So. 3d 291, 313 (¶49) (Miss. 2016)). "The failure to cite authority 'is considered abandonment of the issue; thereby making the issue procedurally barred for appellate review.'" *Id.* Because Green did not provide an argument section in his brief or any legal authority in support of his claim, his claim is procedurally barred.

¶15. Although Green has appealed this matter pro se, "pro se parties should be held to the same rules of procedure and substantive law as represented parties." *Id.* at (¶12) (quoting *Dethlefs v. Beau Maison Dev. Corp.*, 511 So. 2d 112, 118 (Miss. 1987)). "Nonetheless, appellate courts generally afford such litigants some degree of leeway on appeal." *Id.* (quoting *Goodin v. Dep't of Hum. Servs.*, 772 So. 2d 1051, 1054 (¶7) (Miss. 2000)). Accordingly, we will briefly address Green's claim that the chancellor's judgment should be dismissed.

---

improper handling of this case [the chancellor's] Judgment should be dismissed."

¶16.   "The standard of review regarding the decision of a chancellor is well known and well settled." *Moorehead v. Hudson*, 888 So. 2d 459, 461 (¶4) (Miss. Ct. App. 2004).  This Court "will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Okoloise v. Yost*, 283 So. 3d 49, 54 (¶22) (Miss. 2019) (quoting *White v. White*, 26 So. 3d 342, 346 (¶10) (Miss. 2010)).  Further, this Court "will not reverse a chancellor's findings 'where there is substantial evidence supporting those findings.'" *Id*. (quoting *Madden v. Rhodes*, 626 So. 2d 608, 616 (Miss. 1993)).

¶17.   In her bench ruling, the chancellor found that the boundary line between the two properties was the Amite/Wilkinson county line.  The chancellor relied on the surveyor's testimony, which was "supported by Exhibit Number 8, that the county line . . . [was] the blue line . . . between the Green [Property] and the Poirrier Property."  Therefore, the chancellor held that "all of the hatched area, which was indicated and denoted to be the timber trespass area, [was] record-titled owned by [Poirrier]."

¶18.   Next, the chancellor addressed Green's claim that he possessed the property up to a fence line east of the creek.  Relying on the surveyor's testimony, the chancellor explained that remains of a fence were found "down in the ground" along the boundary line.  However, it seems that this fence was a different fence from the one referenced earlier in this opinion. The chancellor noted that the surveyor encountered a discrepancy in that two monuments were located approximately 81 feet from where he expected them to be, presumably based on his review of earlier surveys.  According to the chancellor, the surveyor suggested that the

8

three prior surveys were incorrect because the first survey—upon which the two subsequent surveys relied—did not properly establish the county line. Despite these findings, the chancellor did not find Green's testimony that he believed that the county line was farther east of where it actually was to be credible. The chancellor explained, "[I]f the Green family deemed the property in the disputed area to have been theirs . . . economically it would have made sense for them to have harvested that timber when they harvested the balance of their timber" the first time. Accordingly, the chancellor found that Green failed to prove adverse possession.

¶19. Furthermore, as to the timber-trespass issue, the chancellor stated, "Having now heard the testimony . . . about a complete and total clearcut of the tract that his parents had a record title to 10 to 12 years before this incident arose, the [c]ourt finds that the coming back in here at a later date and removing this timber . . . amount[ed] to a willful act by . . . Green." The chancellor then awarded damages in accordance with Middleton's valuation report that was entered into evidence as Exhibit 19. However, the chancellor seemingly found that Poirrier was only entitled to 85 percent of the total damages in the valuation report. Finally, the chancellor cancelled Green's remaining claims against Poirrier as clouds on title.

¶20. After a review of the record, we find that the chancellor's findings were supported by substantial evidence. Further, the chancellor was not manifestly wrong or clearly erroneous and did not apply an erroneous legal standard. Therefore, we affirm the chancellor's judgment.

¶21. **AFFIRMED.**

9

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**