511 So.2d 112 (1987)
Sylvia A.B. DETHLEFS and Opal Brandenburg
v.
BEAU MAISON DEVELOPMENT CORPORATION and Federal Savings and Loan Insurance Corporation, Receiver for Firstsouth Federal Savings and Loan Association[1].
No. 56877.
Supreme Court of Mississippi.
July 15, 1987.
*113 Sylvia A.B. Dethlefs, pro se.
Opal Brandenburg, pro se.
Stanford E. Morse, Jr., White & Morse, Gulfport, for appellee.
Before HAWKINS, P.J., and ROBERTSON and ANDERSON, JJ.
HAWKINS, Presiding Justice, for the court:
Sylvia Dethlefs and her mother Opal Brandenburg appeal from a chancery court decree of the 1st Judicial District of Harrison County ruling that they had no easement rights in an underground conduit that drained their land. The chancellor also awarded defendant Firstsouth Federal Savings and Loan Association damages on its slander of title counterclaim. Finding Dethlefs had a justiciable claim, we reverse the imposition of damages; and we affirm the chancellor's ruling that no easement existed.

FACTS
This lawsuit involves two lots in Long Beach. Highway 90 runs east and west along the Gulf Coast. White Harbor Road, which once was under water, is a built-up road running north off Highway 90.
Just west of White Harbor Road is a lot approximately 1,000 feet long north and south and 300 feet wide east and west. Adjacent to and just west of this lot is a lot approximately 2,200 feet long north and south and 75 wide east and west. Both these lots have the Gulf as their south border, subject, however, to the right-of-way for Highway 90. The record shows that at least as far back as 1946, when a Mrs. Mary Lary (later Mary Lary Walters) acquired the west lot, there was an artesian well on the property. This well drained into a small artificial pool, approximately three feet deep. The pool, in turn, when it overflowed, drained into a culvert in the west lot through the east lot out into a ditch on the west side of White Harbor Road, which in turn drained into a culvert running under the road and into the Gulf sound. There were at least two masonry catch basins, or clean-out plugs at the land surface over the culvert. At least one was located on the east lot, and the other on the west lot. When Mrs. Lary purchased the west lot, she operated a nursery using the water well and pool. There was no municipal or central water supply system servicing this area at the time, and neighbors used the well for their supply of drinking water. There was also an artesian well on the east lot which had not been used for a number of years.
There was a restaurant located on the east lot until the early 1950s, when the Pine Lodge Tourist Court was also constructed on it.
For an eleven-year period, ending in 1966, Arthur Henderson, Jr., was an employee of the Pine Lodge Court, and recalled that there was a drain from the well on the west lot under the east lot, and he had cleared two catch basins on the Pine Lodge property a number of times. They had metal grills over them, and were visible, although not noticeable.
For a nineteen-year period, beginning in 1957, Robert Wells was an employee at the Lary Nursery. He knew the well drained from the pond through the underground culvert running across the Pine Lodge lot. There were two or three catch basins on the Pine Lodge lot with metal covers. Occasionally he would go over onto the east lot and clean them out. There was also a clean-out plug on the Lary property which he periodically cleaned. Hurricane Camille in September, 1969, destroyed the Pine Lodge Court, after which the lot was left untended. The nursery business continued, however, and Wells saw that the drain continued to function. Wells left the nursery employment in 1975.
Neither Wells nor Henderson had any idea about who originally installed the pipe, or about what agreement was made between the parties who installed the pipe. In the entire period when Wells and Henderson were employed, the pool never *114 overflowed, always draining through the culvert into the White Harbor Road ditch.
The Lary Nursery property was purchased by Dethlefs and her mother Brandenburg in June, 1979. Mrs. Lary (Walters), the seller, showed Dethlefs the clean-out drain. Because of the bushes and over-growth on the Pine Lodge property, the two women did not look for the clean-out basins, but Dethlefs was taken by Lary to the location of the opening of the drain on White Harbor Road, and shown how the water drained through the culvert, into the ditch and then further east under the road into the sound. Even though she had not cleaned out any surface basin on the Pine Lodge property since Camille, Mrs. Lary had not had drainage problems.
Initially Dethlefs and Brandenburg had no drainage problems either. In February, 1982, Dethlefs noticed a "sold" sign on the Pine Lodge property, following which she went to the realty broker to inform her of the drainage easement she considered she had in order that the broker in turn could notify the buyer of the property of this fact, or claim. The broker, however, refused to identify the purchaser.
The property was purchased by Dennis D. Stepanik and Sharion W. Shumock, two of a group of real estate developers who proposed to build and sell condominiums on the east lot. The group employed Robert L. Taylor, a Gulfport attorney, who prepared articles of incorporation of Beau Maison Development Corporation, and on October 30, 1982, the property was conveyed to the corporation.
Beau Maison employed B & L Construction Company of Long Beach to clear off the lot. Dethlefs learned from Charles Bryant of that company the identity of Shumock. She also learned that Taylor was the attorney for the corporation. On November 12, 1982, Dethlefs wrote a letter to the construction company giving it permission to clean the property line between the lots, and also stating that she expected the underground drain would not be disturbed.
There was a public groundbreaking ceremony in November for the development, at which time Dethlefs accosted Taylor, and told him about her "easement," and also pointed out its location. According to her, Taylor told her the buyers were not responsible for any easement, and for her to close off her well and drain the pond. Taylor did tell her no easements showed of record, but his testimony varied from Dethlefs'. According to Taylor, he told Dethlefs that day that he would contact the contractor to review the property. Later, Taylor went to the Pine Lodge property with Shumock and a "Mr. Alford," the project engineer. Taylor testified they could find no sign of a drain, and Alford told them he found no physical sign of one, and that the natural drainage of the land was to the west. Taylor also testified Shumock told him later that he had promised Dethlefs his company would try to install a pipeline to drain her property.
On December 4, 1982, Dethlefs noticed the pool overflowing and on December 10, 1982, representing herself and Brandenburg, filed a motion for a temporary restraining order in the chancery court of the First Judicial District of Harrison County against Beau Maison. Dethlefs holds a realty broker's license, but is not an attorney. She alleged that a drainage easement consisting of underground pipes had existed for more than 36 years, and was a necessary function to drain the pond. She further alleged that if the defendant was not restrained from interfering with the drain, it would cause irreparable harm to their property. On the same day, again representing herself and Brandenburg, she filed a complaint in the circuit court of the First Judicial District of Harrison County against Beau Maison for $200,000 actual and $600,000 punitive damages for interfering with her drainage easement.
On December 16, 1982, the chancery court denied the motion for a temporary restraining order, and no appeal was taken. On February 3, 1983, the circuit judge entered a summary judgment for the corporation from which Dethlefs appealed to this Court. We reversed the summary judgment because there were undetermined factual issues. See: Dethlefs v. Beau Maison *115 Development Corp., 458 So.2d 714 (Miss. 1984). It should be noted here that in all proceedings in the trial courts and in this Court Dethlefs has represented herself, and under a general power of attorney, represented her mother Brandenburg.
In November Beau Maison executed a note and deed of trust to Firstsouth Federal Savings and Loan Association of Pine Bluff, Arkansas, for $5,400,000 to finance development of the property, and Firstsouth made an advance of $727,650. Beau Maison subsequently defaulted and went bankrupt. Firstsouth foreclosed in chancery, and at a commissioner's sale on April 16, 1984, Dethlefs appeared and objected.
On July 9, 1984, Dethlefs filed a complaint in the chancery court of the First Judicial District of Harrison County making essentially the same factual allegations as to her claim to an easement as in her motion for a temporary restraining order. She also alleged that subsequent acts by the defendant Beau Maison stopping the drain had caused overflowing of her property, which had never happened before. She prayed that Beau Maison be required to repair or replace their "drainage easement" and asked for other equitable relief.
On the same date Dethlefs filed a motion to add Firstsouth Federal Savings and Loan Association of Pine Bluff, Arkansas, as a party defendant. The motion alleged that the property had been sold to Firstsouth at a commissioner's sale on April 16, 1984. The motion also alleged that Dethlefs had on January 18, 1983, filed a lis pendens notice in reference to the circuit court action (then on appeal to this Court), and that on July 9, 1984, a lis pendens notice had been filed in reference to the current chancery court action. On July 18, 1984, the chancellor entered an order authorizing the joinder of Firstsouth as a party defendant.
On March 26, 1985, Dethlefs filed an amended complaint charging that all acts done by Beau Maison were done by Beau Maison and Firstsouth. This was answered by Firstsouth on April 10. On July 18, 1985, Firstsouth filed an amended answer, which included a counterclaim against Dethlefs and Brandenburg for slander of their title, and demanding damages, actual and punitive, of $100,000. Beau Maison is apparently insolvent and did not answer.
At trial, Dethlefs sought to show that the underground pipe was put in place between 1945 and 1946. Dethlefs produced a July, 1946, warranty deed and an undated quit claim deed in the Beau Maison chain of title that stated:
This conveyance is made subject to any and all existing rights-of-way and/or easements now in use, over, across, on and under said land for the seawall, electric light and power and telephone and telegraph lines, gas and water mains and the right-of-way of the public beach boulevard. [Emphasis added]
Wells and Henderson testified as to the facts set out previously. Neighbors Russell Gould and Tom Prince testified they knew the Dethlefs pond drained a cross the Beau Maison property and that no flooding problems occurred until Beau Maison had the land cleared.
Plumber Robert Trehern and engineer Edward Craig testified that there was no other way for the pond to drain off. However, there was testimony by Gould that the well had a shut-off valve and was no longer flooding. But Gould testified that was when the water table was low and during the winter the pressure would build up again.
At the close of Dethlefs' evidence, Firstsouth moved to enter judgment for the defendant. Chancellor Morris stated that since it was never proven how an easement was obtained, since there was never any record of a grant of an easement, and since there was no adverse, open or notorious possession, there was no easement by grant or prescription. The chancellor found there was some use there apparently by agreement of predecessors in title, but this use appeared to be peaceful. Addressing the question of easement by necessity, the chancellor stated that apparently the well contained a turn-off valve which would solve Dethlefs' problems. The lower court concluded that the alleged easement was a drainage pipe and not a water main. Accordingly, *116 a judgment was entered for Firstsouth and the bank went forward with its counterclaim.
Firstsouth vice president Joel Cheatham testified Firstsouth did not damage to the Dethlefs property, and it had no direction or control over Beau Maison.
John Kelly, senior vice president of Firstsouth was responsible for managing the Beau Maison loan. After Firstsouth foreclosed on the property, Kelly contacted realtors to list the property for sale. Kelley testified that on February 11, 1985, a Mr. Pfau had committed in writing to buy the property.
Kelly stated that a condition to the contract was that the easement dispute be resolved, and the sale was not closed because of the litigation in the instant case. Kelly calculated Firstsouth's damages to be $63,291 for loss of the sale and $25,000 for interference with business and travel expenses for this trial.
Firstsouth next called Dethlefs to the stand. She stated her understanding of lis pendens law gave her the right to file notice of a lawsuit if it involved property rights. Regarding her complaint, she admitted when she filed that she did not know whether Firstsouth was an agent, servant or employee of Beau Maison. She stated her theory was that Firstsouth damaged the easement by financing the loan, and the only knowledge she had of malice was that Firstsouth made the loan.
Dethlefs had filed an earlier lis pendens notice on 1-18-83 regarding her circuit court case, her damages against Beau Maison. She stated she filed the lis pendens because it was her legal obligation to put everyone on notice and she wanted her interest protected.
The chancellor gave a statement from the bench at the close of all evidence, and proceeded to take Dethlefs to task for the language contained in her pleading. The chancellor stated that nothing was illegal or immoral about lending money on a note, which is all that Firstsouth had done. The chancellor found Dethlefs acted maliciously, beyond any privilege she had, and with a spiteful motive to malign Firstsouth. The chancellor awarded Firstsouth $25,000 for slander of title, $5,000 punitive damages, and $3,000 attorney's fees under Rule 11 sanctions.
Dethlefs appeals from the findings of the chancellor regarding the easement and the slander of title counterclaim.

LAW

I. THE EASEMENT QUESTION
An easement may be acquired by express grant, implied grant (implication), or prescription, which presupposes a grant to have existed. Gulf, M. & O.R. Co. v. Tallahatchie Drainage District, 218 Miss. 583, 67 So.2d 528 (1953). No implied easement exists in the instant case. Hutcheson v. Sumrall, 72 So.2d 225 (Miss. 1954).

A. DID DETHLEFS AND BRANDENBURG ACQUIRE AN EASEMENT BY GRANT?
Dethlefs argues there was an easement by grant from reservations made in deeds to predecessors in title to Beau Maison.
Dethlefs asserts that "water mains" in the July, 1946, warranty deed refers to the underground pipe. As authority, she refers to several dictionaries which define "water main" as "a pipe or conduit for conveying water, as from a reservoir." Webster's.
We do not construe "water main" to be a written easement for the drainage culvert, however. The chancellor disagreed with this interpretation, and it cannot be said that he was manifestly wrong. "Water main" generally refers to potable water being piped in from some source. The water in a water main is generally under pressure in contrast to water in a sewer main or drainage easement. See National Automobile Insurance Co. v. Industrial Accident Comm., 21 Cal. App.2d 156, 68 P.2d 748, 749 (1937).

B. DID THE WEST LOT (THE DETHLEFS AND BRANDENBURG LOT) ACQUIRE AN EASEMENT BY PRESCRIPTION?
Although during oral argument, Dethlefs stated she was not claiming an easement *117 by prescription, the chancellor ruled that no prescriptive easement existed, and the point is preserved in the brief of Dethlefs.
Acquisition of easement by prescription occurs when the use is not only adverse, hostile, and exclusive as to others, but it must also be peaceful, uninterrupted, and continuous, under claim of ownership. Berry v. Houston, 195 So.2d 515, 518 (Miss. 1967) (test for adverse possession). However, use by express or implied permission or license, no matter how long continued, cannot ripen into an easement by prescription, since adverse use, as distinguished from permissive use, is lacking. Patterson v. Harris, 239 Miss. 774, 125 So.2d 545 (1960).
Whether a use is prescriptive or permissive is ordinarily a question of fact to be determined by the chancellor. See, e.g., Patterson v. Harris, supra; Peterson v. Corrubia, 21 Ill.2d 525, 173 N.E.2d 499 (1961).
In the case before us, there was no evidence as to who installed the underground pipe, when the pipe was installed, and whether or not there was any kind of agreement between the parties involved. Since there was a lack of proof established by Dethlefs, the chancellor was justified in presuming that the use was permissive rather than presuming the use was prescriptive. In Person v. Roane, 218 Miss. 621, 67 So.2d 534 (1953), the proof showed only that the drainage ditch which ran across the defendant's land had been open for over 10 years, but there was no proof establishing the basis on which the ditch had been constructed and used. Therefore the chancellor found that the use was permissive. See also the following drainage cases where proof was lacking and the use was presumed to be permissive: Darr v. Carolina Aluminum Co., 215 N.C. 768, 3 S.E.2d 434 (1939); Daudt v. Steiert, 205 S.W. 222 (Mo. 1918); Cohn v. Williams, 60 Pa. D. & C. 221 (1947).
There was sufficient evidence from which the chancellor could infer that initially the culvert was placed on the east lot by permission. It would be difficult to envision a person digging a ditch on another's property and laying a drain without the latter's express permission. That no more than a revocable license was intended is also indicated that there was nothing in writing granting an easement. To change the character of the permit from a license to an easement there would have to be a distinct and positive assertion of a right hostile to the owner of the East lot that such claim was being made. Patterson v. Harris, supra.

II. THE SLANDER OF TITLE ISSUE
The malicious filing for record of an instrument known to be inoperative, and which disparages the title of land, is a false and malicious statement for which damages may be recovered. Walley v. Hunt, 212 Miss. 294, 54 So.2d 393 (1951). Certain communications published in due course of a judicial proceeding are absolutely privileged and will not sustain an action for slander of title. Krebs v. McNeal, 222 Miss. 560, 76 So.2d 693 (1955).
Firstsouth's theory of recovery on slander of title was that by filing lis pendens notices, Dethlefs prevented Firstsouth from being able to sell the land. The lis pendens notice was a privileged communication and therefore not actionable for slander of title. The chancellor expressly found that Dethlefs had a right to assert her interest in the underground pipe, although he expressed great displeasure with the manner in which she proceeded to protect her interest. Since Dethlefs had a valid right to have her case decided, her filing of a lis pendens notice cannot be slander of title. In Sellars v. Grant, 196 F.2d 677 (D.Miss. 1952), plaintiff refused to remove a lis pendens notice after plaintiff was advised by the defendant as to the truth of the facts. The district court held that since plaintiff was not required to accept the defendant's version, but was entitled to have the lawsuit adjudicated on sworn testimony, then plaintiff was not liable to defendant for slander of title. The same rule applies to the instant case.
Firstsouth also attempted to show they lost a sale because of the Dethlefs lawsuit. *118 Firstsouth introduced a contract which showed that a condition of the contract was that the Dethlefs encumberance be removed. Apparently Firstsouth takes the position that since Dethlefs proceeded with her lawsuit, this caused them to lose the sale. As stated, Dethlefs had every right to bring a lawsuit and establish her claim to the underground pipe.
We hold that Dethlefs was not liable for any actual damages, and therefore was not liable for any punitive damages.

III. RULE 11 VIOLATION
For the unfounded charges of Firstsouth's being a participant in Beau Maison's interference with drain, Dethlefs made herself liable to a Rule 11 sanction. Also, the chancellor got exercised, and no doubt properly so, because of her closing argument (which unfortunately is not transcribed in the record).
This is the first Rule 11 case before this Court and the first which involves sanctions against pro se parties. Rule 11 requires that there must be a good faith belief on the part of the one signing the pleading that there are grounds to support it. Rule 11(b) states:
(b) Sanctions. If a pleading or motion is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the pleading or motion had not been served. For wilful violation of this rule an attorney may be subjected to appropriate disciplinary action. Similar action may be taken if scandalous or indecent matter is inserted. If any party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party to pay to the opposing party or parties the reasonable expenses incurred by such other parties and by their attorneys, including reasonable attorneys' fees.
Rule 11(b), M.R.C.P.
Pro se parties should be held to the same rules of procedure and substantive law as represented parties. See Public Interest Bounty Hunters v. Board of Governors, 548 F. Supp. 157 (D.Ga. 1982); Catanzaro v. Masco Corp., 423 F. Supp. 415 (D.Del. 1976).
These cases, however, involved situations where the lawsuit was brought in bad faith. The chancellor below recognized Dethlefs had a justiciable claim, as did this Court in reversing the circuit court summary judgment rendered against her in Dethlefs v. Beau Maison, 458 So.2d 714 (Miss. 1984).
In conjunction with the above, these inflated exaggerated charges caused no damage to Firstsouth. No proof was offered as to any injury caused or resulting from these unfounded charges. The only injury, if any, resulted from having to defend the drainage easement claim, including the lis pendens notice. As we have above noted, Dethlefs and Brandenburg were perfectly at liberty to assert their claim in a court of law. They clearly had a colorable, justiciable claim to an easement through the east lot for a drain.
Nor can we lay the entire blame for this controversy at the feet of Dethlefs. She attempted to inform the incorporators of Beau Maison about the drain through the real estate agent, then through their construction contractor, and finally through their attorney. There is no evidence any of them ever went to the trouble of meeting with Dethlefs and having her point out where the drain was located, or making any attempt to reconcile their differences. Instead, they stopped up the drain, causing her property to flood.
Since Dethlefs had a justiciable claim, we are not disposed to penalize her via Rule 11 sanctions for exaggerating her claim where Firstsouth was put to no additional expense.
Accordingly, we affirm the chancellor's determination that no drainage easement existed and reverse the imposition of damages against Dethlefs.
AFFIRMED IN PART; REVERSED IN PART.
*119 WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
GRIFFIN, J., not participating.
NOTES
[1] During the pendency of this appeal, the FSLIC was appointed Receiver for Firstsouth on December 4, 1986. Pursuant to appellant's motion, we substituted the Receiver for the bankrupt corporation.