# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CA-00980-SCT

*TRANSMONTAIGNE OPERATING COMPANY, L.P.*

*v.*

*LORESCO I, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/20/2021 |
| TRIAL JUDGE: | HON. RHEA HUDSON SHELDON |
| TRIAL COURT ATTORNEYS: | A. ANDRE HENDRICK |
| | COLETTE A. OLDMIXON |
| | ROBERT A. BIGGS, III |
| | JAMES ALTUS McCULLOUGH, II |
| | PATRICK H. ZACHARY |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | A. ANDRE HENDRICK |
| | ROBERT A. BIGGS, III |
| | COLETTE A. OLDMIXON |
| | JASON EDWARD DARE |
| ATTORNEYS FOR APPELLEE: | PATRICK H. ZACHARY |
| | VICKI R. LEGGETT |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 02/02/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     The question before this Court is straightforward—is the successor in title to an express reciprocal easement limited to using the easement in the same way its predecessor did? TransMontaigne Operating Company, LP, sought to enjoin Loresco I, LLC, from using an easement conveyed by Loresco's predecessor, Amerada Hess Corporation (Hess), for any

other purpose or at any other time than Hess had used it. But the chancellor found the clear language of the express reciprocal easement had no such limitation. So do we.

¶2. Contrary to TransMontaigne's assertion, the reciprocal easement's language is not so general about location or uncertain and ambiguous in its terms to necessitate stepping outside the agreement's terms. So instead of looking to Hess's historical use to determine the easement's scope, we stick to the written agreement's specific and clear terms.

¶3. Because TransMontaigne attempts to limit Loresco's use of the express easement in a manner inconsistent with the easement's clear terms, we affirm the chancellor's denial of TransMontaigne's request for declaratory and injunctive relief.

## Background Facts and Procedural History

¶4. TransMontaigne and Loresco are neighboring property owners in Purvis, Mississippi. Both obtained their respective properties from Hess, which had operated an oil refinery on its 1,600-acre property until 1994.

¶5. In 1999, Hess sold TransMontaigne the Purvis Property—a 104-acre tract that included a petroleum terminal facility used for the storage and distribution of large quantities of refined oil product. The Purvis Property did not include the actual property where the oil refinery was located (the Refinery Property). As part of the sale, Hess retained the Refinery Property, which is totally surrounded by the Purvis Property.

¶6. In the Sale of Assets Agreement, Hess agreed not to develop or use the Refinery Property for any commercial purpose that may—in TransMontaigne's view—impede or prove hazardous to its refined oil product storage business. Hess also retained the much

2

larger tract of land near and around the Purvis Property. This larger tract was not subject to any development or use restrictions.

¶7.    As part of the Warranty Deed, Hess and TransMontaigne agreed to an express reciprocal easement. This easement permitted each party to use the paved roads on their respective properties. TransMontaigne used this easement to cross Hess land and gain easier access to Highway 11 from its terminal facility. Hess used this easement periodically to gain access to the Refinery Property to conduct environmental remediation.

¶8.    In 2016, Hess sold Loresco approximately one thousand acres, including the Refinery Property and the acreage surrounding the Purvis Property. Hess also conveyed to Loresco any and all rights to the express reciprocal easement. Loresco began using the easement to gain access both to the Refinery Property and to the other surrounding property obtained from Hess. And Loresco began using its property for other activities beyond environmental remediation, such as hunting and logging.[1]

¶9.    It was Loresco that initially threatened TransMontaigne's use of the reciprocal easement by planning to decommission a bridge on Loresco property that TransMontaigne had been using to travel to Highway 11. This in turn led TransMontaigne to challenge Loresco's use—or, in TransMontaigne's view, Loresco's *overuse*—of the easement. In 2019, TransMontaigne sought declaratory and injunctive relief limiting the scope of

_____

[1] In fact, Loresco conducted no environmental remediation at all. While Hess conveyed the Refinery Property to Loresco, Hess retained the obligation to perform environmental remediation on that property and an easement to go on to the Refinery Property for that purpose.

Loresco's use of the easement to Hess's historical use of the easement, which was to gain access to the Refinery Property for purposes of environmental remediation only.

¶10. TransMontaigne and Loresco filed competing motions for summary judgment. TransMontaigne argued that, based on Hess's historical use of the road easements for environmental purposes, "Loresco's only permissible use of the reciprocal easement [wa]s to access certain property in order to perform environmental and remediation activities." Loresco countered that "the non-exclusive [r]eciprocal [e]asement originally embodied in the 1999 . . . [d]eed and transferred to Loresco in 2017 for ingress and egress to the property" was clear and unambiguous. And it did not limit Loresco's use of the private roads to environmental monitoring and remediation. Loresco asked the chancellor to "declare as a matter of law that Loresco has the right to utilize the private roads in accordance with the non-exclusive [r]eciprocal [e]asement as embodied in the instruments in question."

¶11. After a hearing on both motions, the chancellor granted Loresco's motion for summary judgment and denied TransMontaigne's. The chancellor found that "there was no limiting language which would restrict the use of the easements for future landowners" as suggested by TransMontaigne. The chancellor further found that the 1999 deed was "clear, explicit, and harmonious in all of its provisions and free from any ambiguity." The chancellor held "that Loresco has a right to utilize the private roads in accordance with the non-exclusive [r]eciprocal [e]asements which were originally granted between Hess and TransMontaigne and subsequently transferred to Loresco by the 2017 . . . [d]eed." TransMontaigne timely appealed.

4

**Standard of Review**

¶12.   We review a trial court's summary-judgment rulings de novo, "viewing the evidence 'in the light most favorable to the party against whom the motion has been made.'" *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (Miss. 2013) (quoting *Pratt v. Gulfport-Biloxi Reg'l Airport Auth.*, 97 So. 3d 68, 71 (Miss. 2012), *abrogated on other grounds by Wilcher v. Lincoln Cnty. Bd. of Supervisors*, 243 So. 3d 177 (Miss. 2018)). "Summary judgment is appropriate and 'shall be rendered' if the 'pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Id.* (citing Miss. R. Civ. P. 56(c)).

**Discussion**

¶13.   After de novo review, we reach the same conclusion as the chancellor—Loresco is not limited in its use of the express reciprocal easement by Hess's historical use.

**I.     The Paved-Roads Easement**

¶14.   An easement is "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road)." *Easement*, Black's Law Dictionary (11th ed. 2019). "An easement may be acquired by express grant, implied grant (implication), or prescription, which presupposes a grant to have existed." *Dethlefs v. Beau Maison Dev. Corp.*, 511 So. 2d 112, 116 (Miss. 1987) (citing *Gulf, Mobile & Ohio R.R. Co. v. Tallahatchie Drainage Dist.*, 218 Miss. 583, 67 So. 2d 528, 533 (1953)).   Here, the

5

reciprocal easement was expressly granted in the 1999 deed between Hess and TransMontaigne.

¶15.    The easement acknowledged that "[c]ertain paved private roads are presently located within the Purvis Property and within the Refinery Property" and, likewise, "a private road extends beyond such property across other property owned by Hess to its intersection with State Highway 11." The easement established that "[t]hese roads are necessary for use by both Hess and [TransMontaigne] as to their respective properties." Thus, "[t]o the extent such private roads are located within the Purvis Property, [TransMontaigne] does hereby sell, assign and warrant specially to Hess a non-exclusive easement and right-of-way for the use of such roads." And "[t]o the extent such private roads are located (i) within the Refinery Property or (ii) across other property owned by Hess to its intersection with State Highway 11, Hess does hereby sell, assign and warrant specially to [TransMontaigne] a non-exclusive easement and right-of-way for the use of such roads."

## II.    *Hinson*

¶16.    Despite this specific, clear language, TransMontaigne insists we must go beyond the four corners of the warranty deed. It argues we should instead look to Hess's historical use to determine the scope of the easement. As support, TransMontaigne cites *Capital Electric Power Ass'n v. Hinson*, 226 Miss. 450, 84 So. 2d 409 (1956). *Hinson* dealt with a general power-line easement—an easement that "did not fix the location of the right of way, its length, or its terminal points." *Id.* at 411. Consequently, the power company argued it could lay multiple lines across the Hinsons' property to supply power to neighboring residences.

6

This Court disagreed. We held that despite the easement's broad language, the clear intent was to grant a power-line easement for only those residences on the property. This Court held that "where there is a grant of a right of way easement which is in general terms as to location, length, or terminal points, and is therefore uncertain and ambiguous, it should be interpreted by reference to all attendant circumstances, including the purposes contemplated by the parties at the time of the execution of the grant[.]" *Id.* at 412. Similarly, "where the grant is in general terms, the exercise of the right, with the acquiescence of both parties, in a particular course or manner, fixes the right and limits it to the particular course or manner in which it has been enjoyed." *Id.* at 413.

¶17. Relying on *Hinson*, TransMontaigne asserts that "the [r]eciprocal [e]asement is silent as to the location and scope of the right-of-way granted therein." And "[a]s such, the reciprocal easement constitutes an express right-of-way easement granted in general terms, which means that historic use of the easement fixes its permissible location and scope."

¶18. But TransMontaigne's reliance on *Hinson* is misplaced.

¶19. In reality, the express reciprocal easement is neither couched "in general terms as to location" nor "uncertain and ambiguous." *Id.* at 412. Instead, the 1999 warranty deed notes that the easement between Hess and TransMontaigne is a "non-exclusive easement and right-of-way for the use of . . . roads." The deed specifically references the "paved roads . . . located within the Purvis Property and within the [r]efinery [p]roperty[.]" It also references "a private road [that] extends beyond such property across other property owned by Hess to its intersection with State Highway 11." And if the easement could not be any more clear,

7

the deed specifies that "[t]he road easements . . . include the existing paved area of the roads" as well as "an area extending ten (10) feet on each side of and parallel with the edge of the pavement . . . ."

¶20.    The deed further specifies that "[t]he easements . . . shall remain open and unobstructed at all times except in the case of temporary closures for necessary repair and maintenance at times agreeable to the parties." The deed explains that the "road easements . . . may be utilized for pedestrian and vehicular access, utility lines, storm water drains and discharge lines, fire protection lines and hydrants, communication lines[,] and other support facilities of like nature." Moreover, the deed specifies that Hess and TransMontaigne "agree to share equally all reasonable and necessary costs of repairing and maintaining the paved private roads" and that in the event the property was sold, such "obligation shall be assumed by the successor in title."

¶21.    Furthermore, the *scope* of the easement is not "uncertain and ambiguous." *Id.* Instead, the 1999 warranty deed specifically states that certain "roads are necessary for use by both Hess and [TransMontaigne] as to their respective properties," and it grants a "non-exclusive easement and right-of-way for the use of such roads." The express purpose of the easement, as specified in the deed, is to gain access "to their respective properties."

¶22.    So *Hinson* does not apply. And Loresco is not limited by Hess's historical use of the easement. Instead, as the chancellor correctly concluded, the clear language of the easement controls.

8

### III. The Dissent

¶23. Alternatively, the dissent suggests Loresco is limited by the Sale of Assets Agreement—namely, the right of access granted to Hess to go onto the Purvis Property to conduct environmental remediation. According to the dissent, this limited right of access, which expressly requires Hess to give TransMontaigne advance notice, conflicts with the express reciprocal easement in the Warranty Deed. And because of this conflict, the dissent further asserts, the restrictions in the right of access must control.

¶24. But we see no conflict or contradiction.

¶25. The right of access is just that—granted access to go *onto* the Purvis Property or Refinery Property to conduct environmental remediation. As the dissent points out, when Hess sold the property to Loresco in 2017, it retained this right through an access easement. The reciprocal easement concerns the paved roads across TransMontaigne's and Loresco's respective properties. It grants reciprocal unrestricted rights to use the roads for travel *across* the other's property to get to one's own property. In other words, the two provisions are aimed at two different rights. So the restrictions in the right of access for environmental remediation do not somehow limit the paved-roads easement.

¶26. Nor is Loresco restricted to using its easement across the Purvis Property's paved roads to gain access to the Refinery Property only, as Justice Griffis suggests. In his view, any travel across these roads to get to other Loresco-owned property is not permitted under the reciprocal easement. The problem with his notion is that the suggested restriction is not based on the easement's language—it is simply something he believes should be a restriction.

9

¶27. When Hess sold the Purvis property to TransMontaigne, it retained the Refinery Property, which is landlocked in the middle of the Purvis Property. And it also retained a much larger parcel of property surrounding the Purvis Property. At oral argument, the parties described the Purvis Property as "donut-shaped," with the Refinery Property being the "donut hole." And around the donut-shaped Purvis Property was more Hess property.

¶28. After Loresco purchased the Refinery Property and surrounding Hess land, Loresco began using its easement across the Purvis Property's paved roads not only to get to the donut hole—the Refinery Property—but also to continue across the other side of the donut to access the larger parcel Loresco had also purchased from Hess. It is this latter use of the easement that Justice Griffis deems outside the easement's scope. In his view, Loresco cannot use the easement to traverse the so-called donut—it can only use it to get to the donut hole.

¶29. But the easement before us is not an easement by necessity. *See **Taylor v. Hays**,* 551 So. 2d 906, 908 (Miss. 1989) (describing conditions in which an easement by necessity arises). So there is no requirement that Loresco's property be landlocked to use the easement. For this very reason, TransMontaigne can use its easement across Loresco roads to travel from Highway 11 to the Purvis Property even though the Purvis Property is not completely landlocked either.

¶30. This reciprocal easement is an express easement. And nowhere in the express easement's language does it limit use of the Purvis Property's paved roads to travel to the landlocked Refinery Property. *See **Favre v. Jourdan River Ests.**,* 148 So. 3d 361, 368 (Miss. 2014) ("[I]n the case of 'an express grant, the fact of the creation of the easement, as well as

10

its nature and extent, is determined by the language of the deed, taken in connection with the circumstances existing at the time of making it.'" (quoting **Lanier v. Booth**, 50 Miss. 410, 414 (1874))). It simply does not say what Justice Griffis suggests.

¶31. Instead, the easement acknowledges that there are paved roads not only within the Purvis Property and the Refinery Property but also "across *other property owned by Hess* to its intersection with State Highway 11." (Emphasis added.) The easement goes on to state that "[t]hese roads are necessary for use by both Hess and [TransMontaigne] as to their respective *properties*." (Emphasis added.) And "[t]o the extent such private roads are located within the Purvis Property, [TransMontaigne] [did] hereby sell, assign and warrant specially to Hess a non-exclusive easement and right-of-way for the use of such roads."

¶32. In other words, the express easement acknowledged that Loresco's predecessor in title, Hess, owned more than just the Refinery Property. And instead of limiting Hess's use of the easement to merely get to the Refinery Property, it stated the easement was necessary for use of "their respective *properties*." (Emphasis added.) It did not say the reciprocal easement was necessary for use of just the Purvis Property and Refinery Property respectively.

¶33. Thus, under the reciprocal easement's clear terms, Loresco, as successor in title to Hess, has a right to use the paved roads on the Purvis Property to travel to Loresco-owned properties. Obviously, use of the paved roads as a "cut through" qualifies as expressly permitted "use of such roads."

11

¶34. We also reject Justice Griffis's other finding—that there is a material fact question whether Loresco's use of the Refinery Property for hunting or for any other purpose would constitute a hazard. Our reason for doing so is simple—TransMontaigne never argued to the trial court that Loresco's use of the Refinery Property constituted a hazardous use in violation of the terms of the Sale of Assets Agreement. ***Adams v. Bd. of Supervisors of Union Cnty.***, 177 Miss. 403, 170 So. 684, 685 (1936) ("It is a long-established rule in this state that a question not raised in the trial court will not be considered on appeal.").

¶35. Instead, TransMontaigne solely challenged Loresco's use of the paved-roads *easement* in the Warranty Deed. TransMontaigne's argument has always been that Loresco's using the easement for any other purpose than conducting environmental remediation on the Refinery Property violated the easement, which, due to its general terms, must be limited to how Hess historically used the roads. To be sure, TransMontaigne's ultimate goal appears to be to restrict Loresco's use of its *properties* by restricting use of the easement to those properties. But TransMontaigne does not have the right to dictate how Loresco uses its property other than the limitations imposed on the Refinery Property. And TransMontaigne did not seek in the trial court below to enjoin how Loresco used the Refinery Property based on the Sale of Asset Agreement's use restrictions imposed on the Refinery Property. So the question of whether hunting near or around an abandoned oil refinery constitutes a hazard as contemplated by the Sale of Asset Agreement was never raised or addressed in the trial court. And it is outside the scope of this appeal.

**Conclusion**

¶36.    This appeal is about one thing—the express reciprocal easement.  The sole question is whether Loresco is limited to using the paved roads within the Purvis Property by Hess's prior use.  We affirm the chancellor's ruling that the reciprocal express easement contained no such limitations.

¶37.    **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶38.    TransMontaigne commenced this declaratory judgment against Loresco under Mississippi Rule of Civil Procedure 57(b)(1).  TransMontaigne sought to obtain a declaration of the rights, status, and other legal relations based on the parties' agreements and deeds of conveyance. Before this Court now is TransMontaigne's claim to limit or enforce the restrictions over Loresco's right to access and use the Purvis Property. The chancellor's order denied TransMontaigne a summary judgment and granted Loresco a summary judgment:

> This Court finds that the 1999 Special Warranty Deed and the 2017 Special Warranty Deed were clear, explicit, and harmonious in all of its provisions and free from any ambiguity. The Court finds that Loresco has a right to utilize the private roads in accordance with the nonexclusive Reciprocal Easements which were originally granted between Hess and TransMontaigne and subsequently transferred to Loresco by the 2017 Special Warranty Deed.

The chancellor found no ambiguity in the reciprocal easement and found as undisputed that TransMontaigne granted Hess a general right of ingress and egress on the private roads located on the Purvis Property.  The chancellor rejected TransMontaigne's argument that the

13

court should consider the historical use of the properties. Specifically, for nearly twenty years, Hess used the reciprocal easements for the limited purpose of conducting environmental monitoring and remediation on the Refinery Property.

¶39. The majority affirms the chancellor's judgment. I respectfully disagree and dissent. I find that genuine issues of material fact exist and that Loresco is not entitled to a judgment as a matter of law under Mississippi Rule of Civil Procedure 56(c). I would remand this case for a trial on the merits.

*1. The Property*

¶40. This case considers four parcels of property. Hess bought approximately 1,600 acres in Lamar County, Mississippi in 1971. This property has been used for a petroleum refinery and distribution terminal. I will refer to the original tract as the "Hess Property." The other parcels relevant to this case were conveyed from part of this original 1,600 acres.

¶41. In 1999, Hess sold a portion of the Hess Property to TransMontaigne. The property sold was identified as the Purvis Property. It was surrounded by the Hess Property. Similarly, the Purvis Property surrounded a parcel that Hess had retained, which is identified as the Refinery Property. As part of the sale, Hess and TransMontaigne agreed to a reciprocal easement. The reciprocal easement granted TransMontaigne an easement over Hess's property that consisted of a road from the Purvis Property to State Highway 11. This road is referred to as the "Highway Access Easement." The reciprocal easement also granted Hess an easement over the property sold, the Purvis Property, which is now owned by

14

TransMontaigne. This easement over the roads of the Purvis Property allowed Hess access to its Refinery Property.

¶42.    In 2017, Hess sold the Hess Property and the Refinery Property to Loresco. The sale made Loresco the successor in interest to Hess's rights, duties, and obligations under the reciprocal easement. Thus, Loresco became the owner of the Hess Property, the Refinery Property, and the Highway Access Easement.

¶43.    The following is a photograph of the property. The blue line is Highway 11. The red line is the Highway Access Easement. The green line is the boundary of the Purvis Property. The orange line is the boundary of the Refinery Property. The property surrounding the green line is the Hess Property.



¶44.  This case is to be decided based on the agreements of the parties and the deeds of conveyance.  Hess owned all of the property, approximately 1,600 acres, from 1971 through 1999.

> 2.  *Is TransMontaigne legally entitled to limit or enforce the restrictions over Loresco's access to the Purvis Property?*

¶45.  TransMontaigne's claim for declaratory judgment sought to limit or enforce the restrictions over Loresco's right to access and use the Purvis Property.  The chancellor's decision to deny TransMontaigne's motion for summary judgment and to grant summary judgment in favor of Loresco ruled that TransMontaigne has no right to limit or restrict Loresco's right to access and use the Purvis Property.  The chancellor ruled:

> This Court finds that the 1999 Special Warranty Deed and the 2017 Special Warranty Deed were clear, explicit, and harmonious in all of its provisions and free from any ambiguity. The Court finds that Loresco has a right to utilize the private roads in accordance with the nonexclusive Reciprocal Easements which were originally granted between Hess and TransMontaigne and subsequently transferred to Loresco by the 2017 Special Warranty Deed.

¶46.  TransMontaigne asserted that Loresco has exceeded the scope of the easement by using the private roads on the Purvis Property as a "cut through" rather than to access the Refinery Property. TransMontaigne asserted that Loresco has used the private roads on the Purvis Property so that large eighteen-wheeler trucks can haul cut timber through TransMontaigne's terminal.  Further, TransMontaigne complained that Loresco has given hunters "permission" to use its easement as a "cut through" to access nearby hunting grounds in the Hess Property. TransMontaigne claims that, on numerous occasions, it has caught hunters trespassing on the Purvis Property and that the presence of hunters, with loaded rifles

16

and firearms, presents both environmental and safety concerns to TransMontaigne's petroleum storage and distribution terminal.

¶47. TransMontaigne also asserts that Joseph Tatum, the owner of Loresco, has threatened to hold a shrimp boil and skeet shoot on the Refinery Property, seemingly for the sole purpose of causing TransMontaigne inconvenience and aggravation. TransMontaigne claims that Loresco uses the reciprocal easement over the Purvis Property whenever it wants, for whatever purpose it wants, and without any concern for the easement's historical use and purpose or the disruption that Loresco may cause to TransMontaigne's business. Loresco disputes these allegations and asserts that it was legally entitled to use of the Purvis Property as it saw fit.

¶48. The chancellor agreed with Loresco and found no ambiguity in the agreements or the deeds. The chancellor determined that "the 1999 Special Warranty Deed and the 2017 Special Warranty Deed were clear, explicit, and harmonious in all of its provisions and free from any ambiguity." The chancellor concluded that Loresco has a right to utilize the private roads in the Purvis Property without restriction.

### A. Standard of Review and Governing Law

¶49. This Court will "review the grant or denial of a motion for summary judgment de novo, viewing the evidence 'in the light most favorable to the party against whom the motion has been made.'" *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (Miss. 2013) (quoting *Pratt v. Gulfport-Biloxi Reg'l Airport Auth.*, 97 So. 3d 68, 71 (Miss. 2012), *abrogated on other grounds by* *Wilcher v. Lincoln Cnty. Bd. of Supervisors*, 243 So. 3d 177 (Miss.

17

2018)). "Summary judgment is appropriate . . . if the pleadings [and] affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (citing Miss. R. Civ. P. 56(c)).

¶50. "A court interpreting a deed follows the same process as it does with contracts." *Ryan v. Ray*, 270 So. 3d 230, 234 (Miss. Ct. App. 2018) (internal quotation marks omitted) (quoting *Carmody v. McGowan*, 222 So. 3d 1064, 1065 (Miss. Ct. App. 2017)). "We begin by looking at the language of the instrument itself as contained within its 'four corners.'" *Id.* (internal quotation marks omitted) (quoting *Carmody*, 222 So. 3d at 1065). "If the terms of the [deed] are subject to more than one reasonable interpretation, the [deed] is considered ambiguous." *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Maness v. K & A Enters. of Miss., LLC*, 250 So. 3d 402, 410 (Miss. 2018)).

¶51. Whether a contract is ambiguous is a question of law for the court to determine. *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 283 (Miss. 2005) (citing *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 751 (Miss. 2003)). "In the event of an ambiguity, the subsequent interpretation presents a question of fact for the trier of fact which we review under a substantial evidence/manifest error standard." *Id.* (citing *Clark v. State Farm Mut. Auto. Ins. Co.*, 725 So. 2d 779, 781 (Miss. 1998)).

¶52. The majority's de novo review finds that there was no uncertainty or ambiguity in "the *scope* of the easement." Maj. Op. ¶ 21. The majority then determines that Loresco was granted a "non-exclusive easement and right-of-way for the use of" the roads in the Purvis Property. Maj. Op. ¶ 21 (internal quotation mark omitted). Accordingly, the majority

18

concludes that *Capital Electric Power Ass'n v. Hinson*, 226 Miss. 450, 84 So. 2d 409 (1956), does not apply. Maj. Op. ¶ 22. "And Loresco is not limited by Hess's historical use of the easement." Maj. Op. ¶ 22. "Instead, as the chancellor correctly concluded, the clear language of the easement controls." Maj. Op. ¶ 22.

> B. *The 1999 Sale of Assets Agreement and the 1999 Special Warranty Deed contain conflicting provisions regarding the question of Hess's/Loresco's right to open access over the Purvis Property.*

¶53. The first issue is TransMontaigne's claim that it may limit Loresco's access to the Purvis Property and Loresco's claim that it has the right to open and free access to the Purvis Property.

¶54. In 1999, Hess agreed to sell the Purvis Property to TransMontaigne. The terms and conditions of the sale agreement were memorialized ins set forth in a Sale of Assets Agreement ("the SAA"). In the SAA, TransMontaigne granted Hess access to the Purvis Property only for a specific purpose:

Right of Access and Conduct of Remediation.

9.6.1. After closing, [TransMontaigne] will permit [Hess], its agents, contractors and employees, rent-free *access to the Properties to continue the performance of Cleanup* (which includes, but is not limited to, sampling, installation and maintenance of monitoring wells, or installation of remediation systems) which [Hess] is required to conduct . . . . Prior to initiation or continuation of Cleanup, [*Hess] agrees to provide [TransMontaigne] at least five (5) days prior written notice of the date on which access to a Property is required* and a description of the Cleanup to be conducted. . . .

9.6.2. [TransMontaigne] will cooperate with [Hess] so that [Hess] may conduct Cleanup . . . in a cost-effective and efficient manner. In the conduct of Cleanup, [Hess] *will use all commercially reasonable efforts to minimize any disruption to [TransMontaigne]'s operation of the Properties*.

19

(Emphasis added.) TransMontaigne contends that this provision allows it to restrict access to the Purvis Property and its petroleum storage and distribution facility.

¶55. SAA, Hess, and TransMontaigne then executed the 1999 Special Warranty Deed that actually conveyed the Purvis Property to TransMontaigne. Paragraph 5, which is the reciprocal easement, included the following provision as to access:

> 5. Roads. (a) Certain paved private roads are presently located within the Purvis Property and within the Refinery Property. Also, a private road extends beyond such property across other property owned by Hess to its intersection with State Highway 11. These roads are necessary for use by both Hess and [TransMontaigne] as to their respective properties. To the extent such private roads are located within the Purvis Property, [TransMontaigne] does hereby sell, assign and warrant specially to Hess a non-exclusive easement and right-of-way for the use of such roads. . . . *The easements herein granted shall remain open and unobstructed at all times except in the case of temporary closures for necessary repair and maintenance at times agreeable to the parties.*

(Emphasis added.) Loresco contends that this provision gives it unrestricted access to and over the Purvis Property.

¶56. These provisions, in my opinion, are in conflict and contradict each other. So the question should be which provision controls? That question is answered by the 1999 Special Warranty Deed. Paragraph 14 of the 1997 Special Warranty Deed, titled, "Conflicting Provisions," unequivocally states that "[v]arious provisions of this Deed are intended to supplement the [SAA]. However, *the [SAA] shall prevail to the extent any provision of this Deed is inconsistent with or in conflict with the [SAA]*." (Emphasis added.) Thus, Hess and now Loresco are bound by Sections 9.6.1 and 9.6.2 of the SAA.

20

¶57. Then, in 2017, Hess sold the Hess Property and the Refinery Property to Loresco. Hess and Loresco executed the 2017 Special Warranty Deed. In addition, Hess and Loresco also executed an "Access Easement." In the Access Agreement, Loresco agreed to grant Hess access to the "Property," which includes the Hess Property and the Refinery Property, to comply with its environmental cleanup and remediation obligation. The Access Agreement provided:

> 1. Subject to the terms of the Sale Agreement, *Loresco shall permit, and hereby grants and conveys to Hess, access to and entry upon the Property by Hess*, and Hess's agents, contractors, and employees, *as necessary for Hess to conduct and complete any Cleanup* required under the Sale Agreement Hess *shall give Loresco five (5) business days advance written notice of Hess's intention to access the Property*, identifying such persons who will perform the Cleanup. *Hess shall restrict its activities at the Property to normal working hours 8 a.m. to 5 p.m.), except when responding to emergencies or with the prior written consent of Loresco. Hess will use reasonable efforts to minimum disruption of or interference with Loresco's use of the Property. Hess shall not be deemed in default of its obligations or in breach of the Sale Agreement by reason of any failure to perform caused by the denial of access to the Property*.

(Emphasis added.)

¶58. This language of the Access Agreement is virtually identical to Sections 9.6.1 and 9.6.2 of the Hess/TransMontaigne SAA. The SAA and the Access Agreement, albeit executed eighteen years apart, clearly indicate the scope of Hess's access to the Refinery Property. As TransMontaigne asserts, in both the SAA and the Access Agreement, Hess agreed to provide TransMontaigne and Loresco five days' advance written notice of the date on which it intended to access the Refinery Property for Cleanup. Further, as TransMontaigne asserts, in both the SAA and the Access Agreement, Hess agreed to use all

21

commercially reasonable efforts to minimize any disruption to Loresco's "use of the Property" in the environmental cleanup and remediation.

¶59.    TransMontaigne established that when Hess's agents entered the Purvis Property or the Refinery Property to perform environmental activities, they would notify TransMontaigne of the visit about a week in advance. Hess's agents only performed environmental activities on weekdays from the hours of 6:00 or 7:00 a.m. to 5:00 or 6:00 p.m. When Hess's agents arrived to perform environmental activities, they would drive west on the Highway Access Easement, stop at the gate installed at the entrance of TransMontaigne's terminal facility, enter TransMontaigne's administrative building, sign into a log book, and pass through the terminal facility once granted access by TransMontaigne.

¶60.    Hess has kept a log of all environmental contractor visits to the Purvis Property since October 1999. According to that log, Hess's agents typically performed environmental activities on or around the Purvis Property about one to three times per quarter. Other than a few occasions when Hess's agents would have mowed the grass above some landfills and the rare instance in which a site visit was not recorded because Hess was not performing corrective action that day, the log reflects every instance in which Hess or Hess's agents would have entered the Purvis Property from 1999 through 2019.

¶61.    The SAA, the deeds, and the Access Agreement clearly establish that there was an agreed-upon restriction on Hess's and Loresco's access to the Purvis Property.    The chancellor and this Court are in error as a matter of law when they fail to enforce the

22

restrictions stated in Sections 9.6.1 and 9.6.2 of the SAA. TransMontaigne was entitled to a judgment as a matter of law on this issue.

> B. *The 1999 SAA, the 1999 Special Warranty Deed, and the 2017 Special Warranty Deed contain conflicting provisions regarding the question of whether Loresco's actions constitute a hazard to or significantly impair TransMontaigne's ability to conduct its refined product terminaling and storage business.*

¶62.  The next issue is whether TransMontaigne had the right to restrict Loresco's access to the Purvis Property because Loresco's actions constituted a hazard to or significantly impaired TransMontaigne's ability to conduct its refined product terminaling and storage business.

¶63.  The SAA restricted Hess's use of the Purvis Property:

Use Restrictions – Purvis Property.

26.4.  With respect to [the Purvis Property], *[Hess] covenants and agrees* during the term of its ownership of such property *not to use* or develop such *Refinery Property for any commercial purpose which in [TransMontaigne]'s reasonable judgment could constitute a hazard to or significantly impair [TransMontaigne]'s ability to conduct its refined product terminaling and storage business on property adjacent thereto*, . . . except as needed to conduct operations or activities thereon as currently conducted by [Hess] including [c]leanup activities to be conducted thereon by [Hess] or its contractors or subcontractors pursuant to this Agreement. Further, in the event [Hess] should lease or sell and convey all or any portion of such Refinery Property, [Hess] agrees to incorporate such use restrictions herein referenced in the lease or other conveyance document such that any lessee or acquiror of such Refinery Property shall agree to such use limitations.

(Emphasis added.)

¶64.  Paragraph 6 of the Hess/Loresco 2017 Special Warranty Deed contained "Restrictive Covenants."  Loresco agreed to be bound by the following restrictive covenant:

23

6. Restrictive Covenants. . . .

(e) *The Refinery Property . . . shall not be used* or developed *for (1) any commercial purpose which in the reasonable judgment of [TransMontaigne] could constitute a hazard to or significantly impair [TransMontaigne]'s ability to conduct its refined product terminaling and storage business on property adjacent thereto*, or (2) any residential purpose, including such commercial uses as would have a similar effect, such as the construction or operation of hotels, motels, hospitals, nursing homes and the like so as to limit the utilization of the Refinery Property by humans as much as possible, except as needed to conduct operations or activities thereon as currently conducted by Hess, including environmental investigation, remediation and monitoring activities to be conducted thereon by Hess or its contractors or subcontractors. Further, in the event the Refinery Property or any portion thereof is sold, leased or conveyed, Loresco and its successors and assigns agree to incorporate the use restrictions of this paragraph in any lease or other conveyance document such that any lessee, grantee or other user or occupant of such Refinery Property shall agree to such use limitations. For purposes of this subparagraph (e), the Refinery Property is (1) part of the Property, (2) 28.72 acres, more or less, which is surrounded by the 104.59 acre TransMontaigne property, which in turn is surrounded by the remainder of the Property, and (3) more particularly described in the Exhibit A hereto as the 28.72 acres excepted from the "TransMontaigne Outparcel".

(Emphasis added.)

¶65. Section 26.4 of the 1999 Special Warranty Deed and Section (6)(e) of the 2017 Special Warranty Deed restrict Loresco's use of the Refinery Property. Thus, Loresco "agrees . . . not to use . . . such Refinery Property for any commercial purpose *which in [TransMontaigne]'s reasonable judgment could constitute a hazard to or significantly impair [TransMontaigne]'s ability to conduct its refined product terminaling and storage business* on property adjacent thereto." (Emphasis added.)

24

¶66. It is important to note that Loresco contractually agreed that TransMontaigne would have the discretion to decide in its "reasonable judgment" what activities "constitute a hazard to or significantly impair [its] ability to conduct its . . . terminaling and storage business."

¶67. TransMontaigne presented the affidavit of Kevin Ray Sears, an employee general manager of the petroleum terminal. Sears's stated that TransMontaigne's petroleum terminal on the Purvis Property has the capacity to store 42 million gallons of combustible petroleum products. Sears testified that Joseph Tatum, the owner of Loresco, had threatened to host shrimp boils and skeet shooting events on the Refinery Property. There was also evidence that Loresco allowed hunters to use Loresco's rights under the reciprocal easement to cut through the Purvis Property to get from one side of the Hess Property to the other.

¶68. Sears also testified that, in 2017 and 2018, Loresco engaged in a months-long timber cultivation operation that resulted in multiple truckloads of timber traversing TransMontaigne's Purvis Property on a daily basis in order to access the Refinery Property. Sears stated that due to the proximity of Loresco's trucks to assets on TransMontaigne's Purvis property, including storage tanks, TransMontaigne employees had to continuously monitor Loresco's trucks to insure they were not damaging TransMontaigne's assets and/or creating an unsafe or hazardous situations.

¶69. Sears's affidavit establishes a genuine issue of material fact as to whether TransMontaigne was reasonable in its judgment to conclude that a hazard existed and to restrict a skeet shooting event and unidentified individuals walking through the Purvis Property with rifles, shotguns, or other firearms near 42 million gallons of combustible

25

petroleum products. Likewise, Sears's affidavit establishes a genuine issue of material fact as to whether TransMontaigne was reasonable in its judgment to conclude that large trucks hauling cut timber may significantly impair TransMontaigne's ability to conduct its refined product terminaling and storage business.

>    C.    *Did the reciprocal easement grant Loresco unrestricted use of the Purvis Property?*

¶70.    The majority notes that the 1999 Special Warranty Deed provided for a "non-exclusive easement and right-of-way for the use of . . . roads" and referred to the "paved roads . . . located within the Purvis Property and within the [r]efinery [p]roperty[.]" Maj. Op. ¶ 19 (alterations in original) (internal quotation marks omitted).   This is the reciprocal easement:

> 5.   Roads. (a) Certain paved private roads are presently located within the Purvis Property and within the Refinery Property.  Also, a private road extends beyond such property across other property owned by Hess to its intersection with State Highway 11. *These roads are necessary for use by both Hess and [TransMontaigne] as to their respective properties. To the extent such private roads are located within the Purvis Property, [TransMontaigne] does hereby sell, assign and warrant specially to Hess a non-exclusive easement and right-of-way for the use of such roads.* To the extent such private roads are located (i) within the Refinery Property or (ii) across other property owned by Hess to its intersection with State Highway 11, Hess does hereby sell, assign and warrant specially to [TransMontaigne] a non-exclusive easement and right-of-way for the use of such roads. *The easements herein granted shall remain open and unobstructed at all times except in the case of temporary closures for necessary repair and maintenance at times agreeable to the parties.*

(Emphasis added.)

¶71.    The roads are defined as "[t]hese roads are necessary for use by both Hess and [TransMontaigne] as to their respective properties."  The "respective properties," which are

26

identified and described in the deed, were (1) the Purvis Property, (2) the Refinery Property, and (3) the Highway Access Easement. As the majority describes the Purvis Property, it is like a donut that surrounds the hole—the Refinery Property.

¶72. TransMontaigne agreed that "[t]o the extent such private roads are located within the Purvis Property, [TransMontaigne] does hereby sell, assign and warrant specially to Hess a non-exclusive easement and right-of-way for the use of such roads." The only reason Hess needed this easement was to get to the donut hole, the Refinery Property. Hess did not need access or bargain for access over the Purvis Property to cut through from one side of the Hess Property to the other.

¶73. Hess reciprocated and agreed that "[t]o the extent such private roads are located (i) within the Refinery Property or (ii) across other property owned by Hess to its intersection with State Highway 11 [the Highway Access Easement], Hess does hereby sell, assign and warrant specially to [TransMontaigne] a non-exclusive easement and right-of-way for the use of such roads."

¶74. There is no language in Section 5 of the 1997 Special Warranty Deed that grants an easement over or for the benefit of the surrounding Hess Property or any properties not specifically identified in the reciprocal easement. Rather, the reciprocal easements clearly states that the use of the roads are to the parties' "respective properties." The "respective properties" are (1) the Purvis Property, (2) the Refinery Property, and (3) the Highway Access Easement. Except for the Highway Access Easement, no reading of the reciprocal

27

easement provides for an easement that permits access to the Purvis Property from the surrounding Hess Property.

¶75. In conclusion, as discussed above, I am of the opinion that the chancellor erred and that TransMontaigne was entitled to a summary judgment that would restrict Loresco's access to the Purvis Property as set forth in Sections 9.6.1 and 9.6.2 of the SAA. I am also of the opinion that genuine issues of material fact exist and that Loresco is not entitled to a judgment as a matter of law as to the other issues. Therefore, I would reverse the chancellor's decision to grant Loresco's summary judgment motion. I would remand this case for further proceedings. Because there is an ambiguity, TransMontaigne should be allowed to offer evidence of the historical use of the easement, Loresco's unrestricted use of the Purvis Property, and whether TransMontaigne abused its reasonable judgment when it determined that Loresco's use of the Purvis Property was hazardous or significantly impaired TransMontaigne's business operations.

**KING, P.J., JOINS THIS OPINION.**